FEDERAL DEPOSIT INSURANCE CORPORATION, Appellant,

v.

FIRST INTERSTATE BANK OF DES MOINES, N.A. f/k/a United Central Bank of Des Moines, N.A., Appellee.

Nos. 88–1683, 88–1725.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1988.

Decided Sept. 11, 1989.

Rehearing and Rehearing En Banc Denied Oct. 27, 1989.

Patrick McNulty, Des Moines, Iowa, for appellant.

David L. Charles, Des Moines, Iowa, for appellee.

Before HEANEY,* Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge, and NICHOL,** Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

First Interstate Bank of Des Moines, N.A., formerly known as United Central Bank of Des Moines, appeals from a judgment entered on a jury verdict in favor of the Federal Deposit Insurance Corporation. United Central was held liable for aiding and abetting stockbroker Gary Lewellyn as he defrauded the First National Bank of Humboldt, Iowa (Humboldt Bank) of over $16 million in cash and securities. United Central contends that the district court[1] erred in denying its motions for directed verdict and for judgment notwithstanding the verdict on the aiding and abetting

count, and in instructing the jury on aiding and abetting, arguing that the FDIC produced no evidence that United Central knowingly intended to aid Lewellyn in committing fraud. It also argues that a new trial is warranted by the improper admission and exclusion of evidence, other erroneous jury instructions, and inconsistent answers of the jury to special interrogatories. The FDIC cross-appeals, raising a number of issues which we need not reach and presenting several other arguments as to the calculation of damages which we reject. In all respects, we affirm the judgment of the district court.

Gary Lewellyn is the son of Cliff Lewellyn, the former president of the Humboldt Bank. In 1981 and 1982, Gary Lewellyn stole some $16.7 million from his father's bank by convincing its management to transfer funds and securities to accounts maintained by Lewellyn at United Central. As a result, the Humboldt Bank was declared insolvent on April 2, 1982, and the FDIC was appointed as the receiver of the bank. After Gary Lewellyn was later convicted of embezzlement, mail fraud, and making a false statement, he was sentenced to twenty years' imprisonment. *See United States v. Lewellyn,* 723 F.2d 615 (8th Cir.1983); *FDIC v. National Ass'n of Sec. Dealers,* 582 F.Supp. 72, 73 & n. 2 (S.D.Iowa), *aff'd,* 747 F.2d 498 (8th Cir. 1984).

The mechanics by which Gary Lewellyn defrauded the Humboldt Bank are complex. In four United Central checking accounts, all opened between December 1980 and March 1982, Lewellyn received wire transfers of large amounts of cash or securities from the Humboldt Bank. Lewellyn had convinced the Humboldt Bank that his brokerage firm, G.V. Lewellyn & Co., would restructure the bank's investment portfolio, and that securities which Lewellyn received from the bank would be sold in

* The HONORABLE GERALD W. HEANEY, who was an active judge at the time the case was heard, assumed senior status on January 1, 1989.

** The HONORABLE FRED J. NICHOL, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

order to purchase new ones on its behalf. Lewellyn in fact converted the securities for his own use.

In this appeal, we must consider whether the evidence established that United Central aided and abetted Lewellyn in his fraud. The central issue is whether United Central had knowledge of Lewellyn's scheme as it developed. It is undisputed that Lewellyn maintained at United Central the bank accounts which received securities and funds stolen from the Humboldt Bank, and that United Central provided a variety of banking services to Lewellyn. The parties, however, hotly dispute the character of United Central's knowledge of Lewellyn's conduct and its intent in providing Lewellyn with banking services. On its cross-appeal, the FDIC challenges the district court's granting of judgment notwithstanding the verdict on three theories on which the FDIC prevailed before the jury, those of failure to prevent misappropriation, conversion by an agent, and permitting another to use one's instrumentalities while committing a tort. In view of our decision on the central issues presented by United Central, we need not reach these issues.

## I.

Lewellyn's relationship with United Central began in December, 1980, when G.V. Lewellyn & Co. opened its first account at United Central. Activity in this account remained minimal for several months. In January, 1981, Lewellyn met with James Mackay, a senior vice president at United Central, to arrange a $100,000 unsecured loan. After the meeting, Mackay prepared a memorandum for Hank Wilmer, a senior credit officer at United Central, in which he assessed Lewellyn as a potentially substantial customer. Stating that Lewellyn's business involved tax-sheltered investments rather than stocks and bonds, the memorandum predicted that Lewellyn would realize little income in 1981 and noted that Lewellyn was recently sanctioned by the National Association of Securities Dealers and the Securities and Exchange Commission (SEC). It further warned that

Lewellyn was aggressive and hard to handle, one who would "constantly skate on thin ice and ride the razor's edge." Mackay's memorandum concluded, however, that if Lewellyn were handled properly, he would "pay for his privileges and be a good advocate" of United Central.

In March 1981, the Humboldt Bank began transacting a portion of its securities business with G.V. Lewellyn & Co. The Humboldt Bank authorized the Federal Reserve Bank in Chicago to wire transfer its funds to Lewellyn's account at United Central, believing that securities were to be purchased with these funds through Lewellyn's firm and that these securities were to be held in safekeeping either at Salomon Brothers in New York or at G.V. Lewellyn & Co. In truth, Lewellyn neither enjoyed a relationship with Salomon Brothers nor used the funds that the Humboldt Bank wired to him to buy securities on its behalf.

Thus, on March 13, 1981, the Humboldt Bank wired $508,361 to the G.V. Lewellyn & Co. account at United Central. With this money, Lewellyn made the initial deposit in a repurchase account which he had opened at United Central. By March 30, 1982, United Central was to process 57 additional wire transfers for Lewellyn. The documentation on these transfers identified the Humboldt Bank as sender. Typically, Lewellyn would invest the proceeds of the transfers in a United Central repurchase account, later withdraw the funds in smaller increments, and then deposit them in other accounts which he maintained at United Central.

United Central monitored customer accounts through "exception reports" which noted significant changes in account balances, overdrafts, and problems with uncollected funds. By August 4, 1981, Lewellyn's accounts had appeared twenty times in exception reports and had been overdrawn nine times in amounts up to $42,-829.82. On July 24, 1981, Robert Millen, the president of United Central, had prepared a memorandum which noted that, "Our greatest challenge in handling this customer relationship is to control Gary within his financial means."

When Lewellyn opened a second repurchase account in August, 1981, Lee Anna Chaplin, an assistant in United Central's wire transfer department, suspected that the account was not for legitimate business purposes. She was disturbed that Lewellyn did not furnish her with a tax identification number, and that he directed that confirmation slips be sent to a post office box rather than to the address used for his initial repurchase account. She believed that Lewellyn was "a crook."

On two occasions, Chaplin discussed her concerns with Ronald Nienow, the head of United Central's investment division. Chaplin was told that her concerns would be raised at an upcoming meeting between Lewellyn, Nienow, and Millen. During that meeting, which occurred on August 27, Lewellyn solicited business from United Central. Among other things, he represented that he had maintained large balances in his business accounts. Neinow and James Weiser, another officer in United Central's investment division, later discovered this claim to be false.

By December 31, 1981, Lewellyn's accounts had appeared on United Central exception reports 63 times. He continued to receive wire transfers from the Humboldt Bank, and as before, he transferred most of the sums received to repurchase accounts in order to periodically withdraw money as required. One account of his under the name "GVL Co." was overdrawn four times during the months of October, November, and December, 1981 in amounts as high as $445,449.65.

Despite these prior warnings and irregular account activity, United Central on December 30, 1981 permitted Lewellyn to open a checking account under the name of "GVL/Solomon" without required documentation. At a meeting, Lewellyn told Weiser that the business was a joint venture with Salomon Brothers of New York City, and that Salomon would provide the securities.[2] Weiser, who was familiar with Salomon Brothers by reputation, was not aware of any other brokers of Lewellyn's size with a comparable relationship with Salomon. Weiser mentioned to Lewellyn that "Solomon" was misspelled and the customary "Bros." abbreviation was not used. As to the misspelling, Lewellyn responded that his secretary had made a typographical error. Richard Hickman, a senior investment officer who assisted Weiser in opening the GVL/Solomon account, did not believe from the beginning that Lewellyn truly had a joint venture with Salomon Brothers. Six months earlier, when Lewellyn had opened a joint account at United Central with Swiss American Securities, Inc., William Bunten, senior executive vice president at United Central, called Swiss American to confirm the existence of their relationship with Lewellyn. In the case of the GVL/Solomon account, however, United Central never contacted the firm to ascertain whether it actually dealt with Lewellyn.

On January 5, 1982, United Central received nine securities by wire from the Continental Bank in Chicago directed to "United Des Moines/Cust/GBL/Salomon/First Natl Bank Humboldt." As was the case with Lewellyn's previous wire transactions, these securities were received "free" and thus not transferred against payment. When Weiser advised Lewellyn that the securities had been received in three names, Lewellyn repeatedly asked Weiser to remove the name of the Humboldt Bank. Weiser refused. The securities were returned to Continental on January 6. After being wired back and forth a number of times, they were later accepted

**2.** Securities for the "GVL/Solomon" account were in fact obtained from the Humboldt Bank under "coupon strip agreements." Peat Marwick Mitchell & Co. had advised the Humboldt Bank to enter into these agreements for tax purposes; the bank would sell next due interest on a portion of its securities portfolio, accelerating its cash income. Cliff Lewellyn approached Gary to arrange such an agreement through his purported contacts at Salomon Brothers. Under the contract, Humboldt Bank agreed to sell to GVL/Solomon all next due interest from a list of securities with a par value of $8,990,000. Lewellyn obtained a sample agreement from Peat Marwick but altered its terms so that the underlying securities were transferred, free and clear, to his "GVL/Solomon" account at United Central. United Central was unaware of this agreement until March 31, 1981.

by United Central for GVL/Solomon on January 19.

When Lewellyn on the same day requested a $400,000 loan from United Central, he provided the bank with an updated financial statement. Craig Jordan, of United Central's commercial loan department, noted that Lewellyn's claimed assets had increased by almost $2.5 million in a single year, despite James Mackay's prediction of a year earlier that Lewellyn would realize little or no income in 1981. Similarly, the statement disclosed Lewellyn's substantial purchases of common stock, which contradicted Mackay's earlier observation that Lewellyn's firm would deal in tax-sheltered investments rather than stocks and bonds.

On January 7, thirty-four securities arrived free at United Central for GVL/Solomon. The wires identified the transferor as the Humboldt Bank, not Salomon Brothers. Weiser became concerned as it appeared that control over these securities would shift from the Humboldt Bank to Lewellyn if United Central issued safekeeping receipts, and that the Humboldt Bank appeared to be abdicating control over its portfolio. At a meeting held that day with Neinow and Richard Hickman, another officer in United Central's investment department, Weiser told them of his concern that Lewellyn was misappropriating Humboldt Bank bonds. After the meeting, Neinow and Weiser approached Robert Millen, the president of United Central, and recommended that United Central contact its counsel, the FDIC, the Comptroller of the Currency, or the Securities and Exchange Commission regarding Lewellyn. In response, Millen agreed to speak with Lewellyn but expressed reluctance to act against a good customer.

On January 8, 1982, Millen met with Lewellyn, who stated that the Humboldt Bank wished to restructure its portfolio, that the GVL/Solomon account would be funded with $9 million, two-thirds of which would come from Salomon Brothers, and

that it was easier to have records maintained at United Central. Millen apparently was reassured by this, and after the meeting informed United Central's investment department that problems with Lewellyn had been ironed out. United Central then delivered safekeeping receipts in the name of GVL/Solomon to Lewellyn. From that moment onward, Lewellyn misappropriated $9,976,915 in cash and securities from the Humboldt Bank. This was the amount eventually awarded by the jury to the FDIC.

Beginning on January 18, articles began appearing in the *Wall Street Journal* and the *Des Moines Register and Tribune* that described massive purchases by Lewellyn of certain common stock. United Central's officers were aware of these articles, and James Weiser told others, including Kenneth Myers, the Chairman of United Central, that Lewellyn was buying the stock with assets stolen from the Humboldt Bank.

Lewellyn's account was overdrawn four times between January 1 and January 29, in amounts from $24,608.03 to $420,615.53. His accounts appeared in exception reports 36 times in that period. On February 4, Lewellyn's "GVL Co." account was overdrawn by $147,000, and Lewellyn was brought to the attention of Hank Wilmer, of United Central's commercial loan department, as a possible kite suspect.[3] When Wilmer met with Lewellyn that day, Lewellyn continued to refuse to explain his relationship with Salomon Brothers or to provide supporting documentation. Although Wilmer then told Lewellyn that United Central expected him to close his accounts, this decision was reversed after Lewellyn again met with Millen several days later. Lewellyn's accounts appeared in United Central's exception reports 32 times in February of 1982.

On March 11, 1982, United Central received 12 securities "free" for a Lewellyn account.[4] Again, these securities had the

---

3. Depositors "kite" checks when they make use of fictitious balances by drawing against uncollected funds.

4. In early March, Lewellyn convinced Humboldt Bank management to commit bank funds to what he termed a "securities collateral loan program." Lewellyn told the Humboldt Bank

Humboldt Bank's name on the wire either as recipient or sender. United Central issued safekeeping receipts to Lewellyn on three of these despite irregularities in documentation. On March 22, Lewellyn directed that United Central wire the last of the securities free to the Iowa Des Moines National Bank, but did not provide written documentation. Iowa Des Moines contacted United Central to determine whether Lewellyn actually owned the securities and could negotiate them. After delivering a cashier's check jointly payable to United Central and Lewellyn, Iowa Des Moines contacted Millen to discuss the Lewellyn accounts and suggested that United Central "use extreme care and judgment" in handling Lewellyn. The proceeds of the check were used by United Central to pay outstanding overdrafts in Lewellyn accounts, and the remainder was delivered to Lewellyn for placement in a United Central repurchase account.

In the week preceding March 24, 1982, Lewellyn twice unsuccessfully attempted to cover a $91,000 overdraft. The overdraft was subsequently paid. On March 28 and 29, 1982, articles appeared in the *Wall Street Journal* and in the *Des Moines Register and Tribune* which detailed extensive claims against Lewellyn by brokerage houses and the Securities and Exchange Commission. On March 29 or 30, United Central closed Lewellyn's accounts, handing him $977,423 in cashier's checks, all originating as Humboldt Bank money and securities. At Lewellyn's request, United Central cashed one of these checks, providing him with $100,000 in $50 and $20 bills, enough to fill a small brief case. The next day, an additional $500,000 was wired to Continental on Lewellyn's behalf. Lewellyn received this money at Continental and vanished for three weeks.

The Humboldt Bank was closed on April 2, when it could not account for securities it believed it had purchased through G.V. Lewellyn & Co., and for the securities that it transferred to Lewellyn's accounts at United Central. The FDIC then filed suit against Lewellyn and the directors and officers of the Humboldt Bank, and recovered damages on both claims.

On March 29, 1985, the FDIC, acting under 12 U.S.C. § 1819 Fourth, sued United Central on any claims that the Humboldt Bank had against it. Before trial, the FDIC voluntarily dismissed five of its nine claims. The district court thus instructed the jury on claims of failure to prevent misappropriation of property, aiding and abetting Lewellyn in his theft of the Humboldt Bank's assets, permitting a wrongdoer to use bank services and facilities, and participation in breach of duty as an agent. After trial, the jury returned its answers to special interrogatories, finding that the FDIC had established each of these four claims. It further found that United Central's conduct proximately caused loss to the Humboldt Bank on January 6, 1982, and assessed damages of $9,976,915.

United Central filed a motion for judgment notwithstanding the verdict, a motion for new trial, and an application for pro tanto credit. The district court granted the motion for judgment notwithstanding the verdict on all claims except the aiding and abetting claim. It then denied United Central's motion for a new trial on the aiding and abetting claim. The court also granted United Central a credit of $4,002,134.85 to reflect settlements by the FDIC with brokerage firms and money recovered by the trustee of the Lewellyn bankruptcy estates. Of this amount, $427,134.85 was granted as a setoff for money traceable to Humboldt Bank funds recovered from the Lewellyn estates by the trustee. The district court entered judgment for the FDIC and against United Central in the amount of $5,974,780.15, plus post-judgment interest at the rate of 6.71%.

## II.

It is beyond dispute that Gary Lewellyn defrauded the Humboldt Bank of $16.7 mil-

---

that the bank would loan $2,000,000 par value in securities to Salomon Brothers, which in turn would pledge the issues to secure various deposits and investments of its customers. Under this arrangement, the Humboldt Bank transferred $2,000,000 to the "G.V. Lewellyn & Co." account at United Central.

lion and that United Central rendered banking services to Lewellyn as he did so. It is also beyond dispute that United Central's management knew that Gary Lewellyn was an agressive investor who tended to "skate on thin ice" in his dealings. The central issue presented in this appeal, however, is whether United Central's knowledge and conduct was such as to warrant liability for aiding and abetting Lewellyn in his fraud. United Central argues that the jury instructions improperly stated the elements of a claim for aiding and abetting, and the FDIC failed at trial to establish a submissible case under the correct elements of such a claim.

### A.

This case does not arise under the federal securities laws, but is instead grounded in common law aiding and abetting. As the FDIC has brought this claim pursuant to 12 U.S.C. § 1819(a) Fourth, the basis of the court's jurisdiction is federal question jurisdiction and federal common law is the applicable substantive law. *FDIC v. Braemoor Associates,* 686 F.2d 550, 553–54 (7th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983).[5] Both United Central and the FDIC therefore rely on aiding and abetting law developed under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. In particular, both parties agree that this case is controlled by *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). In *Metge,* we established a three-part test for use in consider-

ing a claim for aiding and abetting under the securities laws:

(1) the existence of a securities law violation by the primary party (as opposed to the aiding and abetting party);

(2) "knowledge" of the violation on the part of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

United Central argues that these are not "elements" so much as "factors" or "variables." While we have recognized that the content of the test is still being delineated by the courts, with its significance not yet fully elaborated, by its nature the test is closely focused on the facts of each case and precedent requires that we apply it. *See Stokes v. Lokken,* 644 F.2d 779, 782–83 (8th Cir.1981) (referring to elements of "test" as "prerequisites").

United Central argues vigorously that the district court's instructions failed to accurately state the elements of the claim under *Metge.* It challenges two instructions. The first set forth in general the elements of an aiding and abetting claim. The second defined when a bank is charged with knowledge that a customer's conduct is unlawful.

The district court's general instruction on aiding and abetting[6] follows the *Restatement (Second) of Torts* § 876(b) (1977), which provides that: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he * * * knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." United Central challenges this standard as dealing

---

**5.** While United Central argues that we must look to Iowa law as the source for this controlling federal common law, the FDIC was appointed receiver of the Humboldt Bank under federal rather than state law. *See* 12 U.S.C. §§ 191, 1821(c). We therefore are not bound by Iowa law. *See Braemoor Associates,* 686 F.2d at 553–54.

**6.** Instruction Number 21 read:

In respect to the FDIC's claim that UCB [United Central] is liable for aiding and abetting Lewellyn in his misappropriation of FNB [Humboldt Bank] property, the FDIC must

prove by a preponderance of the evidence each of the following propositions:

1. That Lewellyn misappropriated FNB property.

2. That UCB knew Lewellyn was misappropriating FNB property.

3. That UCB gave substantial assistance and encouragement to Lewellyn's conduct by which he misappropriated FNB property.

4. That UCB's conduct was a proximate cause of the resulting damages and the amount of those damages.

primarily with liability for physical rather than economic harm. We need not address this issue, however, as the instruction explicitly included the basic elements of knowledge and substantial encouragement established by *Metge*. The district court therefore did not err in giving this general instruction on aiding and abetting.

■ United Central's primary attack is aimed at the district court's definition of "knowledge," contending that *Metge* requires proof of United Central's actual knowledge that Lewellyn was stealing from the Humboldt Bank and that United Central consciously intended to assist Lewellyn in perpetrating the fraud. United Central points to *Metge*'s statement that:

> in the absence of a duty to act or disclose, an aider-abettor case predicated on inaction of the secondary party must meet a high standard of intent. As applied here, *Woodward* and *Monsen* require that the aider-abettor's inaction be accompanied by actual knowledge of the underlying fraud and intent to aid and abet a wrongful act. The requisite intent and knowledge may be shown by circumstantial evidence.

762 F.2d at 625 (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir.1975), and *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978)).

In essence, United Central would have us read the authorities as requiring, in addition to the three elements of the test set forth in *Metge*, that to face liability for aiding and abetting United Central must have "knowingly and consciously intended to substantially assist Lewellyn in the achievement of his criminal activity." This is the central theme advanced by United Central, both as to the jury instructions and as to the submissibility of the FDIC's claim of aiding and abetting. United Central directly argues that any liability for aiding and abetting must be predicated on such a finding of intent and that no evidence adduced at trial supported such a finding. United Central argues that the district court's instruction [7] allowed the jury to find it liable on something less than actual knowledge and conscious intent to defraud, and that the term "general awareness" in the instruction is improper in determining actual knowledge. The FDIC concedes that the district court's instruction contained no requirement of scienter, but replies that wrongful intent is not required for aiding and abetting.

We are convinced that the district court's instruction is in accordance with existing law. Our decision in *Metge* applies the three-part test through a detailed analysis of the facts presented in that case, relying on the earlier appellate decisions of *Woodward* and *Monsen*. In *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir.1975), the court held that the knowledge element is satisfied when the aider and abettor knows that the conduct of its principal is unlawful and that its own role is part of overall improper activity. *Id.* at 95–96. Applying the three-part test to the facts there presented, the court in *Woodward* recognized that the intent requirement becomes greater as the activity in question is more remote. *Id.* at 95. With regard to the knowledge inquiry, however, *Woodward* employs a standard of "general awareness" throughout its discussion. *See id.* In discussing hypothetical instances of aiding and abetting, *Woodward* makes

---

**7.** Instruction No. 22 read:

A bank is charged with knowledge that the conduct of a customer is unlawful when the bank has a general awareness of its overall role in the customer's unlawful scheme and knows that the bank's activities are improper or otherwise in breach of duty when viewed in the context of a customer's overall enterprise. Knowledge can be derived by direct evidence of information conveyed to the bank. Knowledge need not be proven by direct evidence but can rather be proven by circumstantial evidence based on all the facts present, including facts available to its employees, including transactions involving the customer that are unusual in volume or quality or otherwise not in the ordinary course of business.

If you find that UCB [United Central] had a general awareness of its role in the scheme or otherwise knew of Lewellyn's unlawful misconduct, based on all the circumstances present, then you must find the UCB knew that Lewellyn's conduct was unlawful.

clear that knowledge is a "clue to liability" and "may be shown by circumstantial evidence, or by reckless conduct, but the proof thereof must demonstrate actual awareness of the parties' knowledge in a fraudulent scheme." *Id.* at 96. In specifically discussing the liability of banks, it quotes approvingly an article by Professor Ruder, and in so doing points to the essence of the claim:

> If it is assumed that an illegal scheme existed and that the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's knowledge of the illegal scheme at the time it loaned the money or agreed to loan the money provides that additional factor. Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting or conspiracy cases.

*Id.* at 96 (quoting Ruder, *Multiple Defendants in Securities Law: Aiding and Abetting, Conspiracies, In Pari Delicto, Indemnification, and Contribution*, 120 U.Pa.L.Rev. 597, 630–31 (1972)).

The Third Circuit in *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978), discussed the requirement that an aider-abettor have actual knowledge of a securities violation, and that the evidence establish conscious involvement in impropriety or constructive notice of it. *Id.* at 799. *Monsen* goes on to state, however, that such involvement "may be demonstrated by proof that the alleged aider-abettor 'had general awareness that his role was part of an overall activity that is improper.'" *Id.* (quoting *Securities and Exchange Comm'n v. Coffey*, 493 F.2d 1304, 1316 (6th Cir.1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975)).[8]

It is apparent from these authorities that the law in this area is evolving, and that our analysis must be inherently tied to the particular facts before us. We also observe that under the common law, liability is sufficiently established by an aider-abettor's knowledge of the wrong and its awareness of its assistance in furthering the scheme. *Restatement (Second) of Torts* § 876 comment d; *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1357 (3d Cir.1987). We are satisfied that the instructions given by the district court adequately reflected our discussion in *Metge* and that of the cases which provided its foundation, *Woodward* and *Monsen*.

United Central would further have us remand this case for a new trial on the ground that while *Metge* requires an aider and abettor to possess "actual knowledge," *see* 762 F.2d at 625, the district court's instruction permitted the jury to hold United Central liable for mere "knowledge" of Lewellyn's conduct. We are satisfied, in light of *Metge* and its reliance on *Woodward* and *Monsen*, that United Central's argument would require that we dissect "knowledge" too thinly. To charge United Central with knowledge that Lewellyn's conduct was unlawful, the instructions required the FDIC to prove that United Central had a general awareness of its overall role in Lewellyn's scheme and provided that such knowledge could come through circumstantial evidence, including facts available to its employees. We do not believe that *Metge, Woodward,* and *Monsen* require more.

**B.**

 United Central further contends that the FDIC did not establish a submissible case for aiding and abetting. On many occasions we have stated our standard of review of the submissibility of a case. We may find for United Central only if:

---

8. In the more recent decision of *Stokes v. Lokken*, we discussed the circumstances under which recklessness could meet the knowledge requirement, and pointed to precedent that grossly reckless conduct could warrant action in a disciplinary proceeding. 644 F.2d at 783 (citing *Berdahl v. Securities and Exchange Comm'n*, 572 F.2d 643 (8th Cir.1978)). While we refrained in *Stokes* from announcing a comprehensive standard respecting intent in cases such as this, we held that the conduct presented in that case fell short of any reasonable formulation of such a standard. *Id.*

"all of the evidence points one way and is susceptible of no reasonable inferences sustaining the position" of [the FDIC]. Furthermore, we must resolve direct factual conflicts in favor of [the FDIC], assume as true all facts in [its] favor which the evidence tends to prove, and give [it] the benefit of all reasonable inferences. We may not find for [United Central] if the evidence so viewed would "allow reasonable jurors to differ as to the conclusions that could be drawn." *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1218 (8th Cir.1985), *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) (citations omitted); *see also Dace v. ACF Industries*, 722 F.2d 374, 375 (8th Cir.1983). Where there is substantial evidence to support the jury's verdict, we must uphold that verdict. *Washburn v. Kansas City Life Ins. Co.*, 831 F.2d 1404, 1411 (8th Cir.1987). From the record before us, we conclude that a reasonable jury could infer that United Central knowingly rendered substantial assistance to Lewellyn as he defrauded the Humboldt Bank.

Earlier in this opinion we have discussed the evidence presented by the FDIC at trial in great detail. *See supra* Part I. Suffice it to say that United Central knew of the SEC's previous sanctions against Lewellyn, and that one of United Central's officers had reported in a memorandum that Lewellyn was "hard to handle," would "skate on thin ice" and "ride the razor's edge," but that if handled properly Lewellyn would "pay for his privileges and be a good advocate" for United Central. United Central made no inquiry into his authority to open the GVL/Solomon accounts and to receive money and securities wired on behalf of the Humboldt Bank. Although United Central investigated Lewellyn's relationship with Swiss American, it did not make a similar check of his ties to Salomon Brothers despite indications that he had no actual dealing with that brokerage house. United Central tolerated Lewellyn's persistent overdraft status, and although several United Central employees voiced concerns over its relationship with Lewellyn, the bank continued transacting business of substantial quantity with him.

On at least four occasions, United Central officers and employees attempted either to close Lewellyn's accounts or to have regulatory authorities contacted. In each case, higher officers within the bank foreclosed the attempt. For instance, in August 1981, Lee Anna Chaplin told Ronald Neinow, the head of United Central's Investment Department, and James Weiser, a vice president for investments, of concerns and suspicions she entertained regarding Lewellyn's activities. On January 7, 1982, Weiser recommended to United Central president Robert Millen that Lewellyn's activities be reported to the Comptroller of the Currency, FDIC, SEC, or bank counsel because Lewellyn was stealing Humboldt Bank securities. Later in January, Weiser told Kenneth Myers, chairman of United Central's board of directors, that Lewellyn was stealing from the Humboldt Bank. Finally, on February 4, 1982, Hank Wilmer, vice president and senior credit officer of United Central, told Lewellyn to close his accounts at United Central, but was overruled by Millen. Lewellyn's accounts remained open until March 30, 1982, when United Central handed Lewellyn almost one million dollars in cashier's checks representing the last proceeds of Humboldt Bank money and securities.

Taken together and viewed in a light most favorable to the FDIC, this evidence supports an inference that United Central, with potential profits in mind, recklessly chose to continue its relationship with Lewellyn. We are satisfied that this evidence supports the jury's finding that United Central knew that Lewellyn was misappropriating the Humboldt Bank's assets and provided substantial assistance and encouragement to Lewellyn which aided him in transacting these misappropriations.

United Central also maintains that it owed no duty to the Humboldt Bank, that the FDIC seeks to hold it liable for inaction, and that therefore it cannot under *Metge* be held liable absent proof that it possessed *actual* knowledge of Lewellyn's fraud. In particular, United Central argues that the Humboldt Bank was not a customer of United Central, that no fiduci-

ary relationship existed between the two, and that the Humboldt Bank transferred cash and securities "free and clear" to Lewellyn's accounts at United Central. We observe, however, that United Central was under a statutory duty to disclose any intimation it possessed regarding Lewellyn's scheme to regulatory authorities. *See* 12 C.F.R. § 7.5225 (1981).

Further, the record reveals evidence which qualifies this as a case predicated on action. United Central's employees were physically present at the time of the misappropriations. Its facilities and employees were used to transfer cash and securities from the Humboldt Bank to accounts under Lewellyn's control. Lewellyn could not have transferred the property out of his accounts without the assistance of United Central. United Central loaned money to Lewellyn-controlled accounts through repurchase agreements involving property of the Humboldt Bank, and used proceeds to satisfy Lewellyn's overdrafts and other debts, despite its knowledge of the source of the funds and its concerns over the scope of Lewellyn's authority to act for the corporate accounts.

It need not be shown, therefore, that United Central consciously intended to defraud the Humboldt Bank. We have concluded that the district court's instruction adequately stated the elements of common law aiding and abetting, and we are satisfied that the FDIC made out a submissible case of that claim at trial.[9]

### III.

■ United Central bases the first of several other challenges to jury instructions on its duty to maintain customer confidentiality, arguing that the law precluded it from disclosing information on Lewellyn's account activity without Lewellyn's consent to do so. Specifically, United Central objects to a jury instruction [10] based on 12 C.F.R. § 7.5225 (1981). The plain language of the regulation requires a national bank to disclose information concerning a depositor's account to government authorities when it knows or suspects that the depositor is misappropriating bank funds or is engaged in a criminal violation of any section of the United States Code. The district court did not err in giving this instruction.[11]

9. United Central also claims error in the district court's failure to instruct the jury that under Iowa law the FDIC must establish aiding and abetting by a "clear and convincing preponderance of the evidence." *See Hall v. Wright*, 261 Iowa 758, 766, 156 N.W.2d 661, 667–67 (1968). This action is governed by federal common law, however, and United Central cites no federal case using this standard of proof. We decline to adopt it here.

10. *Instruction Number 13 read:*

UCB is asserting that it owed its customers, including Gary V. Lewellyn, a duty to hold in confidence and not disclose to others any information on their accounts in the bank. A bank generally may not make any disclosures concerning a depositor's account without the express or implied consent of the depositor. Whether the customer has expressly or impliedly consented to disclosure is dependent upon the facts of the case and the representations made to the financial institution by the customer. In certain instances, however, the law compels a bank to disclose information concerning a depositor's account to government authorities. The law requires that UCB make a written report to the Regional Administrator of National Banks, the nearest office

of the FBI, and the U.S. Attorney for the bank's district of any of the following events:

1. Any known or suspected theft, embezzlement, check-kiting operation, misappropriation or other defalcation involving bank personnel or bank funds in any amount.

2. Any state of facts growing out of the affairs of the bank known or suspected to involve criminal violation of any other section of the United States Code.

In connection with the FDIC claims against UCB, you should consider whether the circumstances required UCB at any particular time to notify one or more of the above-listed appropriate authorities. In this regard, you are instructed that any misappropriation by Lewellyn in this case was a criminal violation of the United States Code.

11. United Central also argues that the district court erred in instructing that "whether the customer has consented to disclosure is dependent upon the facts of the case and the representations made to the financial institution by the customer," contending that no substantial evidence supported Lewellyn's consent to disclosure and that the instruction was prejudicial in suggesting to the jury that Lewellyn did grant such consent. We believe, however, that the jury could reasonably conclude that Lewellyn

Second, United Central argues prejudicial error in the district court's failure to give its proffered instruction that the FDIC, in retaining or asserting claims of the Humboldt Bank against third parties, was bound by the conduct of the Humboldt Bank. The Eleventh Circuit has held, however, that "when the FDIC in its corporate capacity obtains an asset in the course of a purchase and assumption transaction, for value, in good faith, and without knowledge of these defenses, its rights in the asset are not limited by the defenses of waiver, estoppel, or unjust enrichment." *FDIC v. Gulf Life Ins. Corp.*, 737 F.2d 1513, 1518 (11th Cir.1984); *see also* 12 U.S.C. § 1823(e). In answers to a special interrogatory on estoppel, the jury found that United Central did not establish that the Humboldt Bank misrepresented or failed to disclose to United Central material facts regarding ownership of the securities or limitations on Lewellyn's authority to control the securities, or that the Humboldt Bank intended United Central to act on misleading information or the lack of any limitation on the exercise of control of the securities by Lewellyn. Under these circumstances, any error in failing to give the proposed instruction was harmless.

■ Third, United Central argues that the district court erred in refusing its requested instruction and special interrogatory regarding the three-year statute of limitations established for tort actions commenced by United States agencies. *See* 28 U.S.C. § 2415(b). According to United Central, any cause of action accrued against it no later than March 25, 1982, when a Humboldt Bank employee discovered that United Central was not holding any securities for either the Humboldt Bank or for Gary Lewellyn. Under 28 U.S.C. § 2416(c), however, the FDIC's cause of action did not accrue until April 2, 1982, when the FDIC was appointed receiver of the Humboldt Bank. Prior to that date, the facts material to the claims against United Central were not known, and could not be known, by an official of the United States charged with responsibility to act. The claims against United Central were not time-barred under state law before the FDIC acquired them. The FDIC's action, filed March 29, 1985, was therefore timely.

## IV.

■ United Central argues that the jury's answers to special interrogatories are contradictory and inconsistent with the evidence produced at trial. The jury found that the date on which United Central's conduct proximately caused loss to the Humboldt Bank was January 6, 1982, and the jury calculated recoverable loss from that date.[12] Lewellyn, however, had not stolen any securities as of January 6, 1982. United Central maintains that because one cannot "know" of a crime not yet committed, it cannot as of that date be held to have performed the knowing assistance necessary to sustain aiding and abetting liability.

We conclude that the evidence supports the jury's selection of January 6 as the date on which United Central's knowledge and activity created liability for subsequent losses. Lewellyn by January 6 had already misappropriated over $4 million from the Humboldt Bank through accounts which he

by purportedly opening a joint account with Salomon Brothers impliedly consented to United Central's disclosure of his activities to Salomon Brothers. This implied consent afforded United Central with the opportunity to ascertain the scope and nature of the relationship between Salomon and Lewellyn.

12. The special interrogatory read:

1. Has FDIC established its claim that [United Central] is liable for aiding and abetting Gary Lewellyn in his misappropriation of the money and property belonging to [the Humboldt Bank]?

Yes
_____
Yes or No

2. If you have answered "Yes" to Interrogatory No. 1, set out the date on which you have determined that [United Central's] conduct proximately caused loss to [the Humboldt Bank].

Jan. 6, 1982
_____

3. If you have answered "Yes" to Interrogatory No. 1, what is the total amount of damages, if any, caused by [United Central's] conduct"

$9,976,915

controlled at United Central. By January 6, Weiser knew that Lewellyn was beginning the misappropriation and told senior employees at United Central of this fact the next day. Although United Central argues that one cannot aid and abet a crime not yet consummated, we have no difficulty in concluding that aiding and abetting, by its nature, may occur in the commission of a fraud before the actual misappropriation or other damaging act occurs.

V.

■ The FDIC's expert witness Donald Weber testified as to the way in which experienced bank personnel would view Lewellyn's transactions. United Central challenges the admission of this testimony, citing *United States v. Arenal*, 768 F.2d 263 (8th Cir.1985), for the proposition that an expert witness may not testify regarding the significance of events to a party charged with knowledge. United Central also argues that his testimony was irrelevant in that his conclusions assumed a non-existent duty of inquiry by United Central. We conclude, however, that Weber's testimony assisted the jurors in understanding the function of a bank's investment department, the role of investment officers, and in gauging the importance of various information to these officers in handling investment accounts. *Cf. United States v. Scavo*, 593 F.2d 837 (8th Cir.1979) (expert witness properly testified in bookkeeping trial concerning gaming operations). The district court did not abuse its discretion in allowing Weber's testimony, especially as the jury was properly instructed on their duty to decide fact issues and those of credibility.

■ United Central also claims error in allowing witnesses to testify that Jim Weiser made statements to other United Central officials to the effect that Lewellyn was stealing bonds from the Humboldt Bank. United Central argues that these statements were made without personal knowledge of their accuracy. As a general matter, employee statements made against the interest of an employer are representative

admissions and are admissible. Fed.R. Evid. 801(d)(2)(D). As to the scope of Weiser's personal knowledge, Weiser was second in command of United Central's investment department and had access to all bank records concerning Lewellyn-controlled accounts. In any event, we have held that personal knowledge is not required of an employee admission. *See Mahlandt v. Wild Canid Survival & Research, Inc.*, 588 F.2d 626, 630–31 (8th Cir. 1978). We cannot say that the district court abused its discretion in admitting Weiser's statements.

United Central further argues that the district court erred in excluding an FDIC notice of claims letter to the owner of the Humboldt Bank. The letter charges the Humboldt Bank's directors and officers with wrongful acts and omissions in dealing with Lewellyn. United Central characterizes the document as an admission by the FDIC that Humboldt Bank officials caused the losses at issue in this suit. The district court excluded the letter under Fed. R.Evid. 403, stating that the letter was overly detailed and cumulative of other evidence to be introduced at trial. Indeed, United Central's counsel extensively questioned various witnesses about the conduct of Humboldt Bank officials. The district court did not abuse its discretion in excluding the letter.

VI.

The FDIC on cross-appeal has raised several additional issues related to damages, including the denial of pre-filing interest and pre-judgment interest at the annual rate of 10% and crediting against the judgment the sums received by the FDIC in settlement of claims against brokerage houses and funds received by the bankruptcy trustee from the Lewellyn estates. The district judge gave painstaking consideration to these issues. We have not been convinced that he erred in these respects. We need not unduly burden this already lengthy opinion with detailed discussion of these issues.

We have reviewed the many ways in which United Central attacks this jury ver-

dict, but find none of them to be convincing. Affirmed.