Jon A. CAMP, Appellant,

v.

Robert J. DEMA, James R. Millwee, Alexander Mitchell, and James Kidder, Appellees.

No. 90–2690.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1991.

Decided Nov. 1, 1991.

Robert F. Bartle, Lincoln, Neb., argued (Robert F. Bartle and Laurie Smith Camp, on the brief), for appellant.

Douglas F. Staskal, Des Moines, Iowa, for appellee Kidder

Milton A. Katskee, Omaha, Neb., for appellee Mitchell.

Before WOLLMAN and BEAM, Circuit Judges, and LARSON,* Senior District Judge.

BEAM, Circuit Judge.

Jon A. Camp appeals the district court's order of summary judgment in favor of appellees Alexander Mitchell and James Kidder. Camp alleged that appellees Mitchell and Kidder aided and abetted a violation of securities laws, codified at 15 U.S.C. § 78j (1981) and 17 C.F.R. § 240.-10b–5 (1991) (SEC 10b and Rule 10b–5). The district court held that, *inter alia:* 1) appellees owed no duty to disclose information, 2) appellees lacked knowledge of the securities laws violation, and 3) appellees did not substantially assist the securities laws violation. We affirm.

## I. BACKGROUND

In 1986 and early 1987, Jon Camp owned forty-nine percent of the stock in CPI Qualified Plan Consultants, Inc. (CPI), a closely held Kansas corporation, and he served as one of its directors, officers, and employees. By March 1987, Camp's ownership in CPI had been diluted to thirty-three percent when 870 shares of treasury stock were issued to Robert J. Dema,[1] the president of CPI, for an $85,000 promissory note.

Concerned about possible self-dealing by Dema, Camp made a formal written request to examine the corporate records of CPI. This request was summarily denied by the executive vice president, James R. Millwee,[2] and, in apparent retaliation for this request, Camp was terminated without explanation. Nevertheless, Camp proceeded to obtain a court order to examine the corporate records, which order was granted on May 14, 1987. Pursuant to this authorization, Camp reviewed the corporate records and discovered what he felt were certain improprieties, none of which are the subject of this appeal.

On June 23, 1987, Camp telephoned Kidder, who at that time was a shareholder and director of CPI, and informed him that Camp had been "frozen out" of CPI and that, as a result, he was under a financial squeeze. Camp also told Kidder about alleged breaches of fiduciary duties by Dema and Millwee, discovered in his examination of the corporate records.

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. Dema was a party to the original action but has since settled with Camp.

2. Millwee was also a party to the original action but has since settled with Camp.

Approximately two weeks after his telephone conversation with Kidder, Camp received a letter from CPI's attorney, appellee Mitchell, reminding him of a noncompete agreement that he had entered into with CPI, which CPI felt was still in force. Mitchell and his law firm had been hired by CPI to seek enforcement of the noncompete agreement, to handle matters related to several lawsuits filed by Camp, and to handle the possible purchase by Dema and Millwee of Camp's stock in the corporation.

On September 2, 1987, a special shareholders meeting was held via telephone. Although Camp was still a director of CPI and an owner of its stock, he was not notified of the meeting. At that meeting, Kidder was informed that Camp had sold all his shares of stock in CPI. The sale, however, had not been finalized. Kidder also received information about recent inquiries concerning the purchase of CPI, and voted to approve a motion giving Dema and Millwee authority to pursue "serious negotiations" with two potential buyers. Some time after this meeting, Kidder signed a waiver of preemptive rights waiving his right to purchase a percentage of Camp's shares.

Meanwhile, Mitchell continued working on the purchase of Camp's stock. On September 12, 1987, Mitchell forwarded copies of the stock purchase agreement executed by Camp to Dema and Millwee. Camp's attorney had made several changes in the proposed agreement which required their approval.

On September 14, Mitchell received a telephone call from Dema advising him that the changes made to the stock purchase agreement were acceptable, and that it had been initialed and would be returned to him. He also advised Mitchell that he and Millwee were considering selling CPI and that some preliminary discussions with a potential buyer had taken place. Dema then asked whether Mitchell and his firm would be available to handle any future sale of CPI, to which Mitchell answered affirmatively. However, at that time, Mitchell did not receive any specifics.

The following day, Mitchell received the initialed stock purchase agreement and a copy of a letter of intent from First Actuarial Corporation to CPI along with CPI's response to the letter. Mitchell mailed the initialed documents to Camp's attorney and delivered the First Actuarial letter and response to one of his law partners. Believing that the First Actuarial letter and response were background material for a future transaction, he did not review them. Mitchell performed the remaining acts necessary to consummate the stock sale by Camp.

In mid-October, Mitchell received additional documents concerning the First Actuarial offer and he again delivered these to one of his law partners for review. During the next couple of weeks, documents were sent back and forth among the parties involved in the First Actuarial/CPI purchase and sale. However, it was not until November 6 that an associate of Mitchell's involved in the transaction first learned that Dema, Millwee and First Actuarial had engaged in negotiations prior to the date the Camp stock purchase had been completed. By letter dated November 12, Mitchell advised Camp's attorney of these negotiations and further advised that these negotiations had commenced prior to the conclusion of the stock transaction among Dema, Millwee, and Camp. This appeal is a result of that disclosure. With this background, we turn to the issues on appeal.

## II. DISCUSSION

■ We use the same standard as the trial court in reviewing the entry of summary judgment. *Stokes v. Lokken*, 644 F.2d 779, 782 (8th Cir.1981). Summary judgment may be granted where "no genuine issue as to any material fact [exists] and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Additionally, all facts must be viewed in the light most favorable to the party opposing the motion of summary judgment, and the opposing party must be given the benefit of all reasonable inferences. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir.1980).

A. *The Law of Aiding and Abetting*

To determine aiding and abetting liability, this circuit has adopted a tripartite test, the elements of which are:

(1) a securities laws violation by the primary party (as opposed to the aiding and abetting party);

(2) "knowledge" of the violation on the part of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

*FDIC v. First Interstate Bank of Des Moines, N.A.*, 885 F.2d 423, 429 (8th Cir. 1989). For the purposes of this appeal, we assume a securities laws violation by the primary party. Therefore, we need only examine the second and third elements of our test.

### 1. Knowledge

■ For aiding and abetting liability, the knowledge element is critical. Although the Supreme Court's holding in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), clearly establishes scienter as a necessary element for a primary violation of 10b and Rule 10b–5, this holding does not mandate the knowledge element needed for aiding and abetting liability. Without the holding in *Ernst*, knowledge would still be necessary because it is inherent in the terms "aiding and abetting" themselves. If it were otherwise, aiding and abetting would be indistinguishable from simply aiding. This would cast too wide a net, bringing under it parties involved in nothing more than routine business transactions. *See* David S. Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution*, 120 U.Pa.L.Rev. 597, 632 (1972). For instance, without the knowledge element, a party who, in the normal course of business, transmits documents necessary to consummate a sale may be held liable as an aider and abetter if the transmission somehow aided a securities laws violation. Knowingly engaging in a customary business transaction which incidentally aids the violation of securities laws, without more, will not lead to liability. *See id.*

■ The word abetting actually provides the knowledge element required in aiding and abetting. "[T]he word 'abet' includes knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime." *People v. Terman*, 4 Cal.App.2d 345, 40 P.2d 915, 916 (1935). Therefore, aiding and abetting not only requires assistance, but also knowledge of a wrongful purpose. As we shall see later, this knowledge requirement also permeates the third element of our test.

■ We do not mean to suggest that an alleged aider and abettor may escape liability by simply claiming he was ignorant of the securities laws; however, "a bare inference that the defendant 'must have had' knowledge" of the primary violation is insufficient. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir.1986). Some knowledge must be shown, but the exact level necessary for liability remains flexible and must be decided on a case-by-case basis. Negligence, however, is never sufficient.

■ In *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985), we stated that the knowledge and substantial assistance elements "should be considered relative to one another ... [and] 'where there is a minimal showing of substantial assistance, a greater showing of scienter is required.'" *Id.* at 624 (quoting *Stokes*, 644 F.2d at 784). A party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge. *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1010 (11th Cir.1985). Conversely, a party whose actions are routine and part of normal everyday business practices would need a higher degree of knowledge for liability as an aider and abettor to attach. *See Metge*, 762 F.2d at 625. Recklessness satisfies the knowledge requirement where the defendant owes a duty of disclosure to the plaintiff. The Second Circuit aptly articulated the reasoning for accepting recklessness in *Rolf v. Blyth, Eastman Dillon & Co., Inc.*,

570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). There, the court stated:

> Proof of a defendant's knowledge or intent will often be inferential and cases thus of necessity cast in terms of recklessness. To require in all types of 10b–5 cases that a factfinder must find a specific intent to deceive or defraud would for all intents and purposes disembowel the private cause of action under § 10(b).

*Id.* at 47 (citations omitted). *See also FDIC,* 885 F.2d at 433 (holding a bank had recklessly ignored signs of a depositor's misappropriation).

■■■■ "Under the federal securities laws, a duty to disclose 'arises from the relationship between parties,' and will exist if there is 'a fiduciary or other similar relation of trust and confidence between them.'" *Schatz v. Rosenberg,* 943 F.2d 485, 490 (4th Cir.1991) (quoting *Dirks v. SEC,* 463 U.S. 646, 658, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983) and *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980), respectively). Fiduciary relationships and their concomitant duty to disclose may be established by state or federal law. *See FDIC,* 885 F.2d at 433 (duty existed under 12 C.F.R. § 7.5225 (1981)); *Jordon v. Duff & Phelps, Inc.,* 815 F.2d 429, 436 (7th Cir. 1987) (stating that the "obligation to break silence is itself based on state law"), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1291 (2d Cir.1973) (looking to state law for the fiduciary duties of a corporate director). Where neither state nor federal law has established a duty, the court may still find one by examining five nonexclusive factors under the following test:

1. the relationship of the defendant to the plaintiff;
2. the defendant's access to information relative to the plaintiff's;
3. the benefits derived by the defendant in the relationship with the plaintiff;
4. the defendant's awareness of plaintiff's reliance; and

5. the defendant's activity in initiating the transaction in question.

*Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 653–54 (9th Cir.1988), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989); *see also Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1330 (8th Cir.1991).

### 2. Substantial Assistance

■■■■ If a defendant's knowledge of the securities laws violation is established, we move to the third prong of the analysis—substantial assistance. The assistance must be such that it is "'a substantial factor in causing the resulting'" violation. *Metge,* 762 F.2d at 624 (quoting *Landy v. FDIC,* 486 F.2d 139, 163 (3rd Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974)). There must be a "'substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff.'" *Id.* (quoting *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1084 (N.D.Cal.1979)). By "culpable conduct" we mean conduct that has some element of blameworthiness. The defendant must have some degree of knowledge that his actions are aiding the primary violator. "[I]t is not sufficient that [the defendant] ... engage in acts which, as it turned out, did give assistance ... to the [plaintiff]." Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 6.7(c), at 580 (2d ed. 1986). If a defendant has a general awareness of his role in the primary violator's wrongful activity, however, this may be sufficient to satisfy the knowledge requirement. *FDIC,* 885 F.2d at 430–31.

■■■■ Where a duty to disclose exists, we again allow a recklessness standard to fulfill the knowledge requirement implicit in the substantial assistance element. Additionally, silence is included in the substantial assistance calculus if a duty to disclose exists. *Metge,* 762 F.2d at 625. Therefore, if the defendant has a duty to disclose, the court may deem recklessness in failing to disclose information as substantial assistance.

However, the recklessness involved must be severe recklessness

> "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Woods,* 765 F.2d at 1010 (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)).

B. *Application of the Law*

"Mindful of the potentially devastating impact aiding and abetting liability might have on commercial relationships," *Woods,* 765 F.2d at 1009, we proceed with our application of the law.

### 1. James Kidder
a. *Knowledge of the Primary Violation*
#### i. Duty of Disclosure

■ We first find that Kidder owed no duty of disclosure to Camp. To determine whether a duty between individuals exists, we look, as stated previously, to state law, federal law, or the nature of the relationship between the individuals. *See, e.g., FDIC,* 885 F.2d at 433 (federal law); *Jordon,* 815 F.2d at 436 (state law); *Roberts,* 857 F.2d at 653–54 (relationship between the parties). Since transactions in this case occurred between the directors of a closely held corporation, and this is an area still highly regulated by the states, *Jordon,* 815 F.2d at 436, we look first to state law.

■ CPI is a Kansas corporation with its principal place of business in that state. Therefore, we look to Kansas law to determine whether Kidder had a duty to disclose to his co-director, Camp, information concerning the sale of CPI. In the purchase or sale of corporate shares, Kansas imposes a fiduciary duty between directors the same as if a transaction occurred between a director and a stockholder. *Oberhelman v. Barnes Investment Corp.,* 236 Kan. 335, 690 P.2d 1343, 1347

(1984). Under Kansas law a director must disclose material information to a shareholder before buying from or selling to him. *Blakesley v. Johnson,* 227 Kan. 495, 608 P.2d 908, 914 (1980). However, no cases extend this duty to directors not squarely involved in the stock transaction as sellers or purchasers.

Here, Kidder was not a party to the stock transaction among Camp, Dema, and Millwee. Additionally, Kidder was a minority shareholder and a director in name only. He had no role in corporate management or policymaking. For the most part, Kidder was kept in the dark about the negotiations with First Actuarial, and, at the time he approved of negotiations for the sale of CPI, he was under the belief that the Camp stock sale had been consummated. Accordingly, we hold that Kansas law imposed no duty of disclosure under the circumstances established in this matter.

■ Although Kansas law does not establish a duty between Kidder and Camp, our analysis does not end there. The relationship between the parties may nevertheless rise to the level of a fiduciary one. To determine this we examine the relationship in light of the *Roberts* test mentioned earlier.

First, the relationship between Camp and Kidder was that of co-directors and not one of trust and confidence.

Second, Kidder's access to information was no greater than Camp's. Kidder owned fifteen shares of stock, a minority status when compared to Camp's 870 shares. Although Kidder attended a meeting where the possible sale of CPI was discussed, Kidder was not privy to specific information concerning the negotiations. Kidder was told that two parties had expressed an interest in buying or merging with CPI, when in fact only one party was interested. This deception indicates a deliberate attempt to keep Kidder in the dark about the sale of CPI. Additionally, Kidder was told that Camp's sale to Dema and Millwee had been consummated, and Kidder, therefore, had no reason to suspect

that Camp was either entitled to the information or had not received it.

Third, Kidder received no benefit from Camp's sale of his stock. Camp asserts that bonuses received by Kidder were hush money—i.e. payments for the purpose of keeping Kidder from disclosing to Camp the sale of CPI. Kidder claims that the payments were in reality bonuses for outstanding performance and for training a new employee. Camp produces no evidence to refute these claims. No attempt is made to link the amount of the bonuses to the number of shares sold by Kidder and the per share price First Actuarial was willing to pay for CPI. Further, Camp failed to show that Kidder's bonuses represented atypical business practices by CPI.

Fourth, Camp placed no reliance on Kidder. Although Camp informed Kidder that he had been "frozen out" of CPI and that Dema and Millwee had committed serious fiduciary breaches, this, without more, does not establish reliance. Camp did not discuss his sale of stock with Kidder or seek any advice from him.

Finally, Kidder did not initiate the Camp transaction or take any action to induce the sale.

Finding none of the five factors satisfied, we conclude that a fiduciary relationship requiring a duty to disclose did not exist between Camp and Kidder. *Cf. Lanza*, 479 F.2d at 1289 (stating that a director not participating in a transaction "owes no duty to insure that all material, adverse information is conveyed to prospective purchasers of the stock of the corporation on whose board he sits.").

#### ii. Knowledge

██ Because Kidder did not owe Camp a duty to disclose, the knowledge requirement may not be satisfied by recklessness. *See FDIC*, 885 F.2d at 432–33. To satisfy the knowledge requirement, Camp must show that Kidder had at minimum a general awareness of the primary parties' violation of the securities laws. *Id.* at 430–31. This he fails to do.

Kidder was unaware of the negotiations with First Actuarial or the amount of information received by or withheld from Camp. Kidder voted to authorize Dema and Millwee to pursue serious negotiations to sell or merge CPI, agreed to sell his stock for approximately the same price he had paid for it, and waived his preemptive rights in the sale of the Camp stock. These actions were not so atypical as to make them suspect. *See Woods*, 765 F.2d at 1012. All of Kidder's actions combined fail to serve as a base from which knowledge can be inferred. Accordingly, we hold that this element is not satisfied.

#### b. Substantial Assistance

██ Having determined that Kidder had no knowledge of a securities laws violation, we discuss substantial assistance only briefly.

Camp contends that Kidder's sale of stock, his affirmative vote approving serious negotiations between CPI and potential purchasers, and his waiver of preemptive rights constituted affirmative acts which substantially assisted a securities laws violation. However, as we stated earlier, there must be a "substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to plaintiff." *Metge*, 762 F.2d at 624. No such causal connection exists here. Kidder's sale of stock did not make it possible or easier for Dema and Millwee to acquire Camp's stock, nor did his vote authorizing serious negotiations with prospective purchasers of CPI. No evidence suggests that Camp's sale was in any way contingent on Kidder's sale or that Dema and Millwee would have foregone purchasing Camp's stock without Kidder's vote approving serious negotiations.

Camp had already filed various lawsuits against CPI, Dema and Millwee, for which they all sought settlement. As part of their efforts to compromise, Dema and Millwee agreed to purchase Camp's stock. Camp himself was anxious to sell his stock because he was under a "financial squeeze." In light of this, it is difficult to believe, as Camp suggests, that Kidder's actions were somehow causally connected

to Camp's sale and the securities laws violation.

Additionally, Kidder's waiver of preemptive rights was not unusual. Kidder was a one-percent minority shareholder and terminated his employment with CPI in 1988, after training another employee. His lack of interest in acquiring further shares is not surprising. There is not the slightest indication which suggests that, in the absence of First Actuarial's offer, Kidder would have continued holding his stock after leaving CPI. Again, we fail to see any causal connection between Kidder's actions and Camp's sale.

Camp has failed to demonstrated that Kidder either had the requisite knowledge of a securities laws violation or that he substantially assisted it. Therefore, we find Kidder did not aid and abet a securities laws violation.

### 2. Alexander Mitchell

#### a. Knowledge of Primary Violation

##### i. Duty of Disclosure

■■■■ "Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose." *Barker*, 797 F.2d at 497. Because we find no fiduciary relationship between Mitchell and Camp, we find no duty to disclose existed under the facts.

We find no Kansas law that imposes a fiduciary duty on a lawyer under the circumstances of this case. Nor does the relationship rise to that of a fiduciary under the *Roberts* tests. First, Mitchell's relationship with Camp was an adversarial one and not one of trust and confidence. Second, although Mitchell may have had greater access to information concerning the sale of CPI than Camp, the information was confidential and its possession alone could not create a fiduciary duty to Camp. Third, Mitchell did not benefit from the purchase of Camp's stock. True, Mitchell and his firm did receive a fee for representing Dema, Millwee, and CPI. However, that fee was part of a much larger representation, including the settlement of Camp's suits against CPI and the review of documents pertaining to the First Actuarial/CPI negotiations. In most situations, a lawyer's receipt of fees for transacting a deal will not be considered a benefit under the *Roberts* test. Fourth, competent counsel represented Camp, and he did not rely on Mitchell during the stock transactions. Mitchell did not offer advice, counsel, or opinions to Camp and Camp did not seek any from him. Finally, Mitchell did not initiate the purchase of Camp's stock; to the contrary, it was Camp who alerted Mitchell to the offer made by Dema and Millwee to purchase Camp's stock.

##### ii. Knowledge

■■■■ Because Mitchell had no duty of disclosure, Camp, again, may not rely on recklessness to satisfy the knowledge standard. Camp must show that Mitchell had at minimum a general awareness of a securities laws violation. In this, Camp has failed.

■■■■ Mitchell was unaware of the negotiations with CPI until after the Camp sale was final. Millwee sent Mitchell a letter of intent and other documents from First Actuarial, which Mitchell stated he did not review. Although Mitchell's inaction may be considered grossly negligent, it does not rise to the necessary level of scienter. *See Stokes*, 644 F.2d at 784. To hold otherwise would risk bringing simple malpractice into the embrace of the securities laws. *See Broad*, 642 F.2d at 962 (stating that "simple or even inexcusable negligence" is insufficient). Mitchell's lack of knowledge is also demonstrated by the actions he took upon discovering that negotiations with First Actuarial had taken place while the Camp purchase was in progress. Rather than attempt to hide this information, as one who was intentionally aiding a securities laws violation would presumably do, Mitchell contacted Dema and Millwee and then released the information to Camp's attorney. Mitchell's actions, along with the inferences that can be drawn from the evidence presented, support a finding that Mitchell had no knowledge of the primary securities laws violation.

### b. *Substantial Assistance*

■ We discuss substantial assistance merely to make several points. Attorneys are intimately involved in many, if not most, transactions involving securities. Because of this, we will not easily find actions routinely engaged in by lawyers associated with these types of transactions to constitute substantial assistance without a greater showing of scienter. *See id.; Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir.1975) (stating that when "transactions constitut[e] the daily grist of the mill" courts should be "loathe to find 10b–5 liability without clear proof of intent to violate the securities laws."); *Schatz*, at 497 (holding as a matter of law that "when a lawyer offers no legal opinions or affirmative misrepresentations ... and merely acts [as] a scrivener ... the lawyer cannot be liable ... [as an] aider and abettor ... under the securities laws"). Here, Mitchell's actions were those necessary to consummate the sale of stock. He transmitted documents, contacted the title insurance company, and had the needed waivers and other documents signed. His actions represent the "daily grist of the mill" in this type of transaction. *Woodward*, 522 F.2d at 97. We cannot hold that these actions constitute knowing substantial assistance without a showing of a conscious intent to substantially assist a securities laws violation. *Cf. Metge*, 762 F.2d at 625 (where liability is predicated on silence, a high standard of intent is needed where no duty to disclose exists).

### III. CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.