**FIRST INTERSTATE BANK OF DENVER, N.A. and Jack K. Naber, Plaintiffs–Appellants,**

v.

**Roy I. PRING and Central Bank and Trust Company of Denver, Defendants–Appellees.**

No. 90–1315.

United States Court of Appeals, Tenth Circuit.

July 8, 1992.

Miles M. Gersh (Laurie K. Rottersman of Gersh & Danielson, and Edwin S. Kahn of Kelly/Haglund/Garnsey & Kahn, with him on the briefs), Denver, Colo., for plaintiffs-appellants.

Miles C. Cortez, Jr. (Stephen J. Hensen with him on the briefs), Cortez & Friedman, Denver, Colo., for defendant-appellee Roy I. Pring.

Tucker K. Trautman (Neal S. Cohen and Polly A. Atkinson with him on the briefs), Ireland, Stapleton, Pryor & Pascoe, Denver, Colo., for defendant-appellee Central Bank of Denver.

Before LOGAN and TACHA, Circuit Judges, and BRIMMER, District Judge.[*]

LOGAN, Circuit Judge.

Plaintiffs First Interstate Bank of Denver, N.A. and Jack K. Naber appeal from the district court's grant of summary judgment for defendants Roy I. Pring (Pring) and Central Bank of Denver (Central Bank). Plaintiffs assert claims under § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5.

## I

The securities involved in this case are $11 million in bonds issued in June 1988 by the Colorado Springs–Stetson Hills Public Building Authority (the Authority).[1] Previously, in 1986, the Authority had issued $15 million in bonds. The 1986 and 1988 bonds were similar. Both were issued to reimburse the developer for the cost of public improvements in a planned residential and commercial development in Colorado Springs called Stetson Hills. Bondholders were to be repaid from assessments paid to the developer by commercial builders, or from a reserve fund. The bonds were secured by "landowner assessment liens" covering approximately 250 acres for the 1986 bond issue and approximately 272 acres for the 1988 bond issue. Under the bond covenants the land subject to the liens was required to be worth at least 160% of the bonds' outstanding principal and interest (the 160% test). Plaintiffs purchased some of the 1988 bonds, which later went into default.

The developer of Stetson Hills was AmWest Development I Limited Partnership (AmWest L.P.). The sole general partner of AmWest L.P. was AmWest Development Corporation (AmWest). Three AmWest officers were the only members of the board of directors of the Authority, including David J. Powers, AmWest's majority shareholder and chairman of AmWest's board of directors, and Gregory D. Timm, AmWest's president and a member of its board.

Defendant Pring was involved in the Stetson Hills development as one of the original owners of the property, as an investor in AmWest L.P., and as a creditor, officer, and director of AmWest. Pring and his family in 1983 entered into an option agreement with AmWest to sell the 2135 acres that became the Stetson Hills property.[2] The optionee was changed from AmWest to AmWest L.P. in 1986. AmWest L.P. then partially exercised the option, purchased portions of the property, and began development. Pring and his family continued to own, subject to the option agreement, the remainder of the land within Stetson Hills.

Pring and his family formed Pring Investments, Ltd., a limited partnership, with Pring as the sole general partner; Pring Investments, Ltd. later became a twenty percent shareholder of AmWest. Pring and his wife made a loan of $1.37 million to AmWest; this loan later was converted into a limited partnership contribution in

---

[*] The Honorable Clarence A. Brimmer, Chief Judge, United States District Court for the District of Wyoming, sitting by designation.

[1] The Authority defaulted early in the litigation. Plaintiffs settled claims against the underwriters of the 1988 bonds.

[2] Pring and his wife owned 51% of the Stetson Hills property; other members of Pring's family owned the remaining 49%. In entering the option agreement Pring acted as attorney in fact for the other members of his family.

AmWest L.P. whereby Pring and his wife each came to hold 17.5% interests in AmWest L.P. Pring and his wife also made a loan of $5 million to AmWest L.P. Beginning in 1983 Pring was a vice-president[3] and director of AmWest. In February 1988, before the 1988 bonds were issued, his term as vice-president expired; in December 1988, after the 1988 bonds were issued, he resigned as director.

Central Bank served as the indenture trustee for both bond issues. In January 1988 Central Bank received an "updated" appraisal of the land securing the 1986 bonds that also included the land proposed to secure the 1988 bonds.[4] This appraisal was performed by Joseph Hastings, the appraiser who in 1986 had performed the original appraisal of the land securing the 1986 bonds. The updated appraisal showed land values essentially unchanged from the earlier 1986 appraisal.

Thereafter Central Bank became aware of serious concerns about the adequacy of the security for the 1986 bonds and the accuracy of the Hastings appraisal. Central Bank received from the senior underwriter of the 1986 bonds a letter that expressed concern that the 160% test was not being met. The letter also expressed concern about declining property values in Col-

orado Springs and the fact that they were operating on an appraisal that was over sixteen months old. The letter suggested that the Authority may have given "false or misleading certifications" of compliance with the bond covenants. I R. tab 12, ex. G at 455.[5] Subsequently, after reviewing the updated Hastings appraisal, the 1986 underwriter wrote a second letter to Central Bank expressing serious concerns that the updated appraisal was using outdated real estate values.

Central Bank investigated. Some information contradicted the 1986 underwriter's concerns.[6] Central Bank asked its own in-house appraiser to review the Hastings updated appraisal. He did so, expressed concerns about the age of comparable sales used and the methodology used, and suggested that there be an independent review of the appraisal. Apparently Central Bank trust officer Cheryl Crandall calculated that even under the Hastings appraisal, the collateral value did not meet the 160% test. See I R. tab 12, ex. B at 115. In light of all the foregoing, as trustee for the 1986 bonds, in a letter dated March 22, 1988, Central Bank required "that an independent review of the appraisal be conducted by a different appraiser." I R. tab 12, ex. I. Central Bank's letter to Timm stated

3. Pring and others state that he was only an "honorary" vice-president.

4. Central Bank rejected the "updated" appraisal because it combined the property securing the 1986 bonds and that proposed to secure the 1988 bond issue. The appraiser, Joseph Hastings, later separated the appraisals.

5. The letter closed with the following two paragraphs:

At this date we are operating on an appraisal that is over 16 months old. In light of the declining property values in Colorado Springs and the foreclosure sales, many of which have occurred within the vicinity of the collateral, an appraisal that reflects property values similar to those utilized for the 1986 appraisal of record should be suspect and not relied on without further independent check. As Trustee, you have the authority to name an independent appraisal if you are not satisfied.

It appears that the officers of the Stetson Hills Building Authority have failed to conform to the Bond Covenants to which they agreed. In the interest of the bondholders I call upon you to the [sic] enforce the cove-

nants or Invoke the Remedies. It is our opinion that, based on your statement to us and based on the project analysis, in addition to a reserve fund deficiency the Stetson Hills Public Building Authority is not meeting either the 110% or the 160% Test.

I R. tab 12, ex. G at 456.

6. Central Bank inquired as to why the values in the updated appraisal were substantially unchanged from the original appraisal despite declines in local real estate values. A representative of AmWest and the Authority, Timm, said the reason was that $10 million in improvements had been added to the property since the original appraisal. Timm wrote Central Bank's trust officer handling the 1986 bonds that the concerns expressed in the 1986 underwriter's letter were "unfounded." II Supp.R. tab 65. In addition, a different underwriter for the planned 1988 bond issue disputed several things in the 1986 underwriter's letters, including the method of calculating the 160% test and the suggestion that the Authority may have made false or misleading certifications. See II Supp.R. tab 72, ex. 72B.

three reasons for requiring an independent review: (1) the comparable sales data was outdated; (2) the methodology did not consider a bulk sale in a forced liquidation context; and (3) considering the local real estate market the values appeared "unjustifiably optimistic." *Id.*

Thereafter there was a flurry of meetings and communications between Central Bank and Timm and others.[7] The ultimate result was that Central Bank agreed to delay an independent review of the Hastings updated appraisal until the end of the year, approximately six months after the closing on the 1988 bond issue.

At least by March 1988 Pring knew that the appraisal had been questioned and that AmWest was experiencing or anticipating cash flow problems. Pring had communications with Timm in which AmWest expressed a need to acquire additional land under the option agreement. AmWest proposed that, instead of Pring receiving cash for the land purchase, Pring finance the purchase and requested that Pring agree to "cash flow arrangements." Pring refused.[8] It is undisputed that Pring stayed silent and took no action to bring what he knew to the attention of plaintiffs. From the proceeds of the 1988 bond issue Pring received almost $2 million from AmWest L.P. as payment for land purchases and as interest due on Pring's $5 million loan to AmWest L.P.

The December 1988 appraisal was begun, but the Authority refused to complete it. The 1988 bondholders were notified of the Authority's technical default. Thereafter, the Authority defaulted on payments on the 1988 bonds.

Plaintiffs allege that the 1988 bonds were sold as part of a fraudulent scheme. Plaintiffs allege that the official statement for the 1988 bonds was materially false and misleading by, inter alia, (1) representing the Hastings updated appraisal as being reliable, prudent, and correct; and (2) failing to disclose certain facts, including that Pring had refused to extend additional credit to AmWest, that Pring would receive almost $2 million from the bond proceeds, that serious concerns had been raised about the accuracy of the Hastings updated appraisal, that Central Bank had required an independent review of the appraisal, that the developer had refused to provide it, and that Central Bank later had agreed to delay the independent review until December 1988.

## II

We review de novo the district court's summary judgment rulings. *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319 (10th Cir. 1991). We apply the same standard as the

---

**7.** On March 31 a Central Bank vice-president, Ken Buckius, met with Timm and representatives of the underwriter for the proposed 1988 bonds. Timm assured Buckius and the others that the Hastings appraisal, in fact, had considered more recent comparable sales and these had not materially affected the values. Timm also said that Hastings had used the proper methodology. Apparently Timm indicated a willingness to add approximately $2 million worth of property to the 1986 assessment lien to bring the 160% test into compliance. Timm offered to have Hastings provide a certification regarding the updated appraisal. Timm objected to Central Bank's requirement of an independent review of the Hastings updated appraisal and offered instead to have a different appraiser do a new appraisal at the end of calendar year 1988.

Central Bank's trust committee met on or about April 5 to consider Timm's proposal to delay the independent review. The committee agreed to accept the proposal. This agreement, with conditions that included adding approximately $2 million worth of property to the assessment lien, was conveyed to Timm in a letter dated April 8 from Buckius. *See* II Supp.R. tab 75. Thereafter, on May 13, a little more than one month before the closing on the 1988 bonds, Timm sent a letter to Central Bank on behalf of the Authority and the developer. The letter indicated that annual appraisals of the land securing the 1986 bonds and the proposed 1988 bonds would be provided, with the first of these to be completed within ninety days of December 1, 1988. Buckius countersigned the letter, signifying Central Bank's agreement. *See* II Supp.R. tab 240.

**8.** The record includes a letter from Timm to Pring with the following handwritten notation at the bottom: "Met with [Timm]. Told him I had as much money involved in AmWest now, as I ever intend to have. I will not loan more money or forego payments due us, voluntarily." I R. tab 13, ex. G.

district court: "[s]ummary judgment is appropriate 'if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c)). We must view the evidence in the light most favorable to the party opposing summary judgment. *World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). If a reasonable trier of fact could return a verdict for the nonmoving party, summary judgment is inappropriate. *See Windon Third Oil & Gas Drilling Partnership v. FDIC,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

We first address plaintiffs' § 20(a) claim that Pring is liable as a controlling person of the issuer through his relationship with AmWest L.P. and AmWest. The district court applied the following two-part test for a controlling person: "(1) [defendant] actively participated in overall management and operation of the controlled entity and (2) [defendant] actively participated, in some meaningful sense, in the fraud perpetrated by that entity." I R. tab 17 at 4 (citing *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir.1973) (en banc); *Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 478 (W.D.N.Y.1987)). The district court held that Pring was not a controlling person because "plaintiffs' evidence fails to establish that Pring *actually participated in the alleged fraud* of the developer or the issuer of the [b]onds." *Id.* (emphasis added). Because it looked to plaintiffs' evidence, the district court clearly put the burden on plaintiffs to show that defendant actually participated in the alleged fraud.

■ We begin our analysis with the language of the statute. Section 20(a) of the Securities Exchange Act of 1934 provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The statute first defines a controlling person as one "who, directly or indirectly, controls any person [who is] liable" for violations of the securities laws.[9] The final clause of the statute provides that even if a person is a controlling person, he nevertheless is not liable if he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." The statutory language clearly suggests a two-step analysis for § 20(a) liability: (1) determining whether the defendant is a controlling person; and (2) if so, determining whether the defendant nevertheless is entitled to the good-faith defense stated in the statute's final clause.

This court has addressed the definition of controlling person under § 20(a) in only one prior case. In *Richardson v. MacArthur,* 451 F.2d 35 (10th Cir.1971), we stated that "[t]he statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable.'" *Id.* at 41–42 (quoting *Myzel v. Fields,* 386 F.2d 718, 738 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)). We went on to hold that an insurance company was a controlling person over an employee who handled virtually all of the company's business in one state. *Id.* at 42. Our conclusion in *Richardson* that one can be a controlling person despite exercising only *indirect* control follows the language of the statute.

More recently this court addressed the controlling person provision of § 15 of the

---

9. In the regulations of the Securities and Exchange Commission (SEC) control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Securities Act of 1933,[10] 15 U.S.C. § 77o, in *San Francisco–Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co.*, 765 F.2d 962 (10th Cir.1985). Although § 15 and § 20(a) are not identical, the controlling person analysis is the same. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir.1990) (en banc), *cert. denied*, — U.S. —, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). In *Carstan Oil*, we said that a plaintiff had established a prima facie case of controlling person liability "when the [primary] violation was established, and when this defendant was shown to be a controlling person." 765 F.2d at 964. We stated that to be a controlling person one "need not have been involved in the particular transaction which became the subject of the litigation." *Id.* at 965. We also said that "[t]he defendant had the burden to demonstrate the" defense provided in the last clause of § 15. *Id.* at 964.

We believe that the allocation of the burdens for controlling person liability under § 20(a) should be the same as under § 15. A natural reading of both statutes is that a plaintiff's prima facie case consists of both a primary violation and "control" by the alleged controlling person. The final clause of both statutes ("unless the controlling person ..."), suggests that determining the defense should follow a finding that the defendant is a controlling person. Furthermore, circuit precedent is that the defendant has the burden to establish the defense under § 15, and like the Fifth Circuit "we are not aware of any reason the burden of proof should be different, especially since the sentence structure of the two statutes is similar." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 n. 23 (5th Cir.1981).

Placing the burden of establishing the defense on the defendant makes sense because "there would be little reason for the controlling person provision unless it differed in some meaningful ways from the

standards for noncontrolling person liability." *Id.* A number of other circuits place the burden of establishing the defense on the defendant. *E.g.*, *Hollinger*, 914 F.2d at 1575 & n. 25 (citing cases from the Second, Fifth, Sixth, Seventh and District of Columbia Circuits); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985) ("good faith and lack of participation are affirmative defenses in a controlling person action"), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 *and cert. denied*, 474 U.S. 1072, 106 S.Ct. 832, 88 L.Ed.2d 804 (1986). Thus, once a plaintiff establishes a primary violation and that the defendant is a controlling person under § 20(a), the defendant then has the burden to show that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Nowhere in the statute does it say that to be a controlling person a defendant must have actually participated in the primary violation. "[T]he statute premises liability solely on the control relationship, subject to the good faith defense. According to the statutory language, once the plaintiff establishes that the defendant is a 'controlling person,' then the defendant bears the burden of proof to show his good faith." *Hollinger*, 914 F.2d at 1575.

Thus, the language of the statute causes us to reject those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation. *See, e.g., Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981) (§ 20(a) requires " 'culpable participation' in the securities violation"), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir.) (controlling person must "in some meaningful sense [be a] culpable participant[ ] in the acts perpetrated by the controlled person"), *cert. denied*, 444 U.S. 868,

---

**10.** Section 15 provides:
> Every person who ... controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such con-

trolled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
> 15 U.S.C. § 77o.

100 S.Ct. 143, 62 L.Ed.2d 93 (1979); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973) (en banc) (same). Rather, the language of the statute leads us to join those circuits that hold that a plaintiff need not prove that the defendant actually or culpably participated in the primary violation. *E.g., Hollinger*, 914 F.2d at 1575 ("a plaintiff is *not* required to show 'culpable participation' "); *Metge*, 762 F.2d at 631 (rejecting the more restrictive culpable participation test); *G.A. Thompson & Co.*, 636 F.2d at 958 ("the statute ... [does not] require participation in the wrongful transaction"). This conclusion is consistent with this circuit's test for a controlling person under § 15. *See Carstan Oil*, 765 F.2d at 965.

Under this allocation of the burdens, the district court erred when it placed on plaintiffs the burden regarding defendant's actual participation in the primary violation. Actual participation in the primary violation is not part of plaintiffs' prima facie case under § 20(a); rather, nonparticipation in acts inducing or constituting the primary violation, and good faith, are part of defendant's defense.

■ Applying the broad definition of control in the statute and the SEC regulation, we hold that the evidence viewed in the light most favorable to plaintiffs would support a finding by the trier of fact that Pring is a controlling person of the Authority for purposes of § 20(a). Pring was (1) a director of AmWest at all relevant times; (2) a vice-president of AmWest until February 1988; (3) the sole general partner of Pring Investments, Ltd., a twenty percent shareholder in AmWest; (4) with his wife, a thirty-five percent interest holder in AmWest L.P.; (5) with his wife, a $5 million creditor of AmWest L.P.; and (6) with his wife, and as attorney-in-fact for others in his family, the owner and controller of the remaining land under the option agreement with AmWest L.P. These facts demonstrate that Pring was in a position of at least indirect control over AmWest and AmWest L.P. Because AmWest and AmWest L.P. controlled the Authority,[11] Pring's at least indirect control extended to the Authority.

Having determined that the evidence is sufficient to avoid summary judgment against plaintiffs on the issue whether Pring is a controlling person, the second step of the § 20(a) analysis is whether Pring can establish that he acted in good faith and did not participate in acts inducing the primary violation. We leave the determination of this question for the district court on remand.

### III

■ Next we address plaintiffs' aider-and-abettor claims against Pring and Central Bank under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5. To establish aider-and-abettor liability a plaintiff must prove (1) the existence of a primary violation of the securities laws by another;[12] (2) knowledge of the primary violation by the alleged aider-and-abettor; and (3) substantial assistance by the alleged aider-and-abettor in achieving the primary violation. *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir.1992); *accord K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 977 (8th Cir.1991), *petition for cert. filed,* —— U.S. ——, 112 S.Ct. 2993, 120 L.Ed.2d 870 60 U.S.L.W. 3755 (U.S. Apr. 22, 1992) (No. 91–1692); *Schatz v. Rosenberg*, 943 F.2d 485, 495 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir.1990).[13]

---

**11.** AmWest controlled AmWest L.P. as its sole general partner. AmWest's chairman of the board, AmWest's president, and another AmWest officer constituted the entire board of directors of the Authority and thus controlled it.

**12.** Neither defendant argues that plaintiffs' evidence fails to establish a material question of fact as to the existence of a primary violation, which relieves us of further inquiry on the first element.

**13.** Although the three elements seem to be universally accepted, some circuits state the second and third elements as a general awareness by the alleged aider-and-abettor that his or her role was part of an overall activity that was improper; and the alleged aider-and-abettor knowingly and substantially assisted the primary violation.

## A

■ Pring's motion for summary judgment was granted by the district court on the ground that "silence and inaction are not bases tó establish substantial assistance absent an additional fiduciary duty to disclose." I R. tab 17 at 5. Plaintiffs do not contend that Pring owed them a duty to disclose. Rather, plaintiffs argue that Pring's silence and inaction, in light of what he knew about AmWest and the appraisal,[14] did constitute substantial assistance because Pring had actual intent to aid the primary violation.

■ When there is no duty to disclose, it is sometimes stated absolutely that silence or inaction cannot be the basis for aider-and-abettor liability. *E.g., Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495–96 (7th Cir.1986) ("When the nature of the offense is a failure to 'blow the whistle', the defendant must have a *duty* to blow the whistle."). The weight of authority, however, is that even absent a duty to disclose, silence and inaction can be substantial assistance for aider-and-abettor liability *provided* the defendant consciously intended to assist the primary violation. *E.g., Schneberger v. Wheeler*, 859 F.2d 1477, 1480 (11th Cir.1988), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989); *Moore v. Fenex, Inc.*, 809 F.2d 297, 303–04 (6th Cir.), *cert. denied*, 483 U.S.

1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987); *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 800 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d. 323 (1978); *Woodward v. Metro Bank*, 522 F.2d 84, 97 (5th Cir.1975). For example, in *Metge* the court said that

in the absence of a duty to act or disclose, an aider-abettor case predicated on inaction of the secondary party must meet a high standard of intent. As applied here, *Woodward* and *Monsen* require that the aider-abettor's inaction be accompanied by actual knowledge of the underlying fraud and intent to aid and abet a wrongful act. The requisite intent and knowledge may be shown by circumstantial evidence.

762 F.2d at 625. In evaluating whether silence was accompanied by a conscious or actual intent to assist the primary violation, courts have examined whether the alleged aider-and-abettor benefitted from such silence. *See, e.g., K & S Partnership*, 952 F.2d at 978; *Metge*, 762 F.2d at 629; *cf. DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.) (on the issue of defendant's mental state, ask if "the defendant has thrown in his lot with the primary violators," e.g., did defendant have anything to gain (quoting *Barker*, 797 F.2d at 497)), *cert. denied*, —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Barker*, 797 F.2d at

See *Fine v. American Solar King Corp.*, 919 F.2d 290, 300 (5th Cir.1990), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991); *Schneberger v. Wheeler*, 859 F.2d 1477, 1480 (11th Cir.1988), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989); *Moore v. Fenex, Inc.*, 809 F.2d 297, 303 (6th Cir.), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987); *Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777 (1st Cir.1983); *Investors Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C.Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980). The Third Circuit has used both formulations. *Compare Landy v. FDIC*, 486 F.2d 139, 162–63 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) *with Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). The Seventh Circuit considers the three elements to be additional requirements beyond a showing that the alleged aider-and-abettor committed a proscribed "manipulative or deceptive" act with the same scienter as for primary liability. *See, e.g.,*

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 947 (7th Cir.1989). Although the Ninth Circuit generally states the elements as in the text, a recent case expressly includes in the second element the alleged aider-and-abettor's reckless disregard of the wrong and his or her role in furthering it. *See Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir.1991).

**14.** The record makes clear that Pring knew that AmWest needed to buy additional land to use as collateral. Pring's own admissions support plaintiffs' contentions that he was aware of concerns regarding the appraisal and that an independent review would be delayed until after the bonds were issued. *See* I R. tab 13, ex. A at 114–16. Pring does not challenge the existence of a material question of fact as to the second element of aider-and-abettor liability, i.e., scienter. However, regarding the third element of substantial assistance, we assume that Pring does controvert the existence of conscious intent to assist the primary violation.

497 ("If the plaintiff does not have direct evidence of scienter, the court should ask whether the fraud (or cover-up) was in the interest of the defendants."). This analysis is appropriate in this case.

Plaintiffs' evidence establishes that Pring had a substantial personal stake in the 1988 bond issue. Pring knew that he and his family would receive a substantial payment from AmWest L.P. from the proceeds of the 1988 bond sale.[15] Based on the record, a jury could find that Pring had a strong motivation to stay silent despite what he knew. Pring's possible motivation is in sharp contrast to the lesser motivations courts have held insufficient to show conscious intent. *See, e.g., DiLeo*, 901 F.2d at 629 (accountant's fees for two years of audits); *National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 207 (2d Cir.1989) (insurance company's premium for a guarantee). Viewing the evidence in the light most favorable to plaintiffs, the nonmoving parties on summary judgment, the trier of fact reasonably could conclude that Pring had a conscious intent to assist the alleged primary violation and that had Pring not stayed silent plaintiffs would not have suffered losses. Thus, there was a genuine issue of material fact as to the third element of substantial assistance and summary judgment on plaintiff's aiding-and-abetting claim against Pring was inappropriate.

## B

Central Bank's motion for summary judgment was granted by the district court on the ground that plaintiffs failed to raise a genuine issue as to the element of scienter. The district court determined that plaintiffs had not established a duty to

disclose by Central Bank. Then, citing only *National Union Fire Ins. Co. v. Eaton*, 701 F.Supp. 1031 (S.D.N.Y.1988), the district court concluded that without a duty to disclose, recklessness does not satisfy the scienter requirement for aider-and-abettor liability.

Central Bank argues that recklessness is not sufficient scienter because it had no duty to disclose. Without such a duty, Central Bank asserts, the required scienter is conscious intent, citing *Woodward, Ross, Monsen*, and *IIT v. Cornfeld*, 619 F.2d 909 (2d Cir.1980). Central Bank argues that it did not have conscious intent to assist the primary violation, and that in any event it did not substantially assist the primary violation. Plaintiffs' primary argument is that even without a duty to disclose, recklessness is sufficient scienter. Plaintiffs contend that Central Bank acted recklessly by affirmatively agreeing to delay the independent review of the Hastings updated appraisal. Plaintiffs also assert that Central Bank did provide substantial assistance to the primary violation.

 We agree with Central Bank's argument and the district court's conclusion that Central Bank owed plaintiffs no duty to disclose. An indenture trustee's duties are strictly defined and limited to the terms of the indenture. *See, e.g., Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir.1988). The Trust Indenture Act of 1939 expressly provides that "the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture." 15 U.S.C. § 77ooo(a)(1). Section 9.01(a) of the indenture at issue here provided that the trustee at relevant times "undertakes to perform such duties

---

**15.** The February 24, 1988 letter from Timm to Pring indicates AmWest's plan to use $725,000 in "Funds available from the Bond Issue" to purchase land from the Pring family. I R. tab 13, ex. E at 3. In his deposition, Pring acknowledged a May 17, 1988 letter from Timm that included "[a] summary of the bond closing payments to the Pring shareholders and limited partners." I R. tab 13, ex. A at 130. Furthermore, in a letter dated June 15, 1988, the day before the bond closing, AmWest gave Pring "a detailed listing of the amounts which AmWest is arranging to remit to you from the proceeds of our June 16th bonds closing," which indicated a grand total payment of $1,965,932.08. I R. tab 13, ex. I. Although Pring's answers were somewhat hedged on the question of where the funds came from, *see* I R. tab 13, ex. A at 136–38, he admitted that the notation "Re-closing of 6/16/88" on the June 15 letter was in his handwriting, *id.* at 136, and the trier of fact could conclude that he in fact did know that the source of funds was the 1988 bond issue.

and only such duties as are specifically set forth in this [i]ndenture." II Supp.R. 53.

■ But the lack of a duty to disclose is not dispositive in this case. As Central Bank concedes, the Trust Indenture Act of 1939 "does not affect 'the rights, obligations, duties [, or] liabilities of any person' under the federal securities laws." Answer Brief of Defendant–Appellee Central Bank at 29 (quoting 15 U.S.C. § 77zzz). It is clear that in a proper case it is possible for an indenture trustee to be held liable as an aider-and-abettor. *See Cronin*, 619 F.2d .at 861–862 (reversing grant of summary judgment for defendant indenture trustees and remanding for further discovery despite the district court's belief "that the [trustees'] duties were limited by the terms of their indenture agreements"); *Lewis v. Marine Midland Grace Trust Co.*, 63 F.R.D. 39, 45–46 (S.D.N.Y.1973) (denying defendants' motions to dismiss and indicating that if the elements of aiding-and-abetting liability are established the defendant indenture trustee can be liable); *cf. Ross v. Bank South, N.A.*, 837 F.2d 980, 1003 (11th Cir.) (implying that an indenture trustee could be liable if plaintiffs had *evidence*, as opposed to just conclusory allegations, that the trustee had knowledge of the fraud), *vacated*, 848 F.2d 1132 (11th Cir.1988), *on reh'g*, 885 F.2d 723 (11th Cir.1989) (en banc), *cert. denied*, 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990). Thus, Central Bank is not immune from liability if plaintiffs can prove the elements of aider-and-abettor liability.

The established rule is that recklessness is sufficient scienter for a primary violation of § 10(b) and Rule 10b–5. *E.g., Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982); *accord, e.g., Van Dyke v. Coburn Enters., Inc.*, 873 F.2d 1094, 1100 (8th Cir. 1989) ("[t]he majority rule in the Courts of Appeals is that recklessness satisfies th[e] scienter requirement"; citing cases from the Second, Third, Fifth, Seventh, Ninth, Eleventh and District of Columbia Cir-

cuits).[16] The Seventh Circuit has said that aiding-and-abetting liability requires "the same mental state [as] required for primary liability." *Barker*, 797 F.2d at 495. This circuit, in at least three cases involving claims of both primary and aiding-and-abetting liability, has indicated that recklessness is sufficient scienter without distinguishing between the claims. *See C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429,.1435 (10th Cir.1988); *Cronin v. Midwestern Okla. Dev. Auth.*, 619 F.2d 856, 862 (10th Cir.1980); *Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 595–96 (10th Cir.1979).

Several courts expressly have held that recklessness satisfies the scienter requirement for aiding-and-abetting liability. *See, e.g., Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir.1991) (including recklessness in the scienter element and citing cases); *FDIC v. First Interstate Bank*, 885 F.2d 423, 432–33 (8th Cir.1989) (holding recklessness sufficient in a case predicated on action); *Dirks v. SEC*, 681 F.2d 824, 844–45 (D.C.Cir.1982) (opinion of Wright, J.) (Two leading aiding-and-abetting cases "do not imply that 'knowingly * * * assist' or 'general awareness' require a higher standard for aiding or abetting liability than the general scienter standard required by *Ernst & Ernst*. Recklessness would have been enough." (footnote omitted)), *rev'd on other grounds*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). This court has said that "a proper showing of reckless conduct *might* satisfy [the] state of mind requirement" for aiding-and-abetting liability. *Decker v. SEC*, 631 F.2d 1380, 1388 & n. 16 (10th Cir.1980) (aiding-and-abetting claim under 15 U.S.C. § 80a–17(e)(1)) (emphasis added).

Some courts, however, have indicated that recklessness is not sufficient scienter for aiding-and-abetting liability unless the defendant had a fiduciary duty. *See, e.g., Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d

---

**16.** Recklessness satisfied the scienter requirement for common law fraud. *See, e.g., Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1024 (6th Cir.1979). Although negligence is not sufficient, the Supreme Court has left open the question of whether recklessness is sufficient scienter for a violation of § 10(b). *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976).

Cir.1979) ("We have not used the 'recklessness' standard when money damages are claimed in an aiding and abetting context, except on the basis of a breach of fiduciary duty."), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980).[17] *See generally* William H. Kuehnle, *Secondary Liability Under the Federal Securities Laws—Aiding and Abetting, Conspiracy, Controlling Person, and Agency: Common–Law Principles and the Statutory Scheme,* 14 J.Corp.L. 313, 327–30 (1989) (stating that while some courts have adopted recklessness as a general standard for aiding-and-abetting liability, many courts use a recklessness standard only in certain circumstances, including where there is a fiduciary duty); Don J. McDermett, Jr., Note, *Liability for Aiding and Abetting Violations of Rule 10b–5: The Recklessness Standard in Civil Damage Actions,* 62 Tex.L.Rev. 1087, 1103–08 (1984) (same, finding the fiduciary duty requirement particularly clear in the Second Circuit, but indicating that some Second Circuit opinions have either hesitated to accept the requirement or have gone to great lengths to find some duty).

In this case Central Bank has mischaracterized plaintiffs' claim as one alleging that Central Bank improperly did not disclose certain facts. It is true that the primary violation alleged by plaintiffs includes the nondisclosure in the official statement of certain facts. It is also true that plaintiffs' aiding-and-abetting claim against Pring is based on the allegation that his silence and nondisclosure assisted the primary violation. But plaintiffs' claim against Central Bank is different. Plaintiffs allege that Central Bank assisted the primary violation by *affirmative action,* specifically by affirmatively agreeing to delay the independent review of the Hastings appraisal.[18]

■ Thus we arrive at the issue before us: when an alleged aider-and-abettor owes no duty to plaintiffs, but takes affirmative action that assists the primary violation, does recklessness satisfy the scienter requirement for aiding-and-abetting liability? In light of the affirmative nature of Central Bank's alleged assistance, the nondisclosure cases relied on by Central Bank are inapposite. Central Bank asserts that "[t]here is simply no decision in this Circuit or any other which imposes aider and abettor liability upon a finding of recklessness where there is not also a breach of a duty to disclose." Answer Brief of Defendant–Appellee Central Bank at 22. However, such cases do exist, and they are the ones that are relevant here.

The Ninth Circuit's recent opinion in *Levine* is particularly enlightening. In that case the court addressed the potential liability of a trust company and a bank as aiders-and-abettors of an allegedly fraudulent diamond investment scheme. 950 F.2d at 1483–85. The trust company allegedly assisted the primary violation by, inter alia, allowing its name to be used in promotional materials, accepting telephone inquiries from investors, and issuing confirmations to investors. *Id.* at 1484. The bank allegedly assisted the primary violation by, inter alia, sending an officer to certain seminars, coordinating the handling of investor inquiries, making certain representations to investors, and considering but apparently not making an amendment to a deposit

17. We have quoted language from the Second Circuit that even if a defendant is reckless, "absent a fiduciary duty owing from [defendant] to [plaintiff] there is no aiding and abetting liability." *Farlow,* 956 F.2d at 987 (quoting *Ross,* 904 F.2d at 824). This quotation, however, was made during the course of a lengthy discussion of various cases, and *Farlow* did not adopt this view as the law of this circuit.

18. In the district court plaintiffs argued that Central Bank both affirmatively acted to delay the independent review of the Hastings appraisal and failed to alert plaintiffs of the risks related to the Hastings appraisal. I R. tab 1 at 13–14 (complaint); I R. tab 12 at 1 (brief opposing motion for summary judgment (emphasizing "affirmative steps")). The district court's order only deals with plaintiffs' claim of affirmative acts. Furthermore, on appeal, plaintiffs appear to have abandoned the argument that Central Bank improperly was silent. *See* Reply Brief for the Plaintiffs–Appellants at 23 ("Central characterizes plaintiffs' showing as nothing more than an argument that Central passively failed to 'blow the whistle' on the Hastings appraisal. Central says it did not have a duty to be a whistle blower. But this is distinctly not plaintiffs' argument.").

agreement to conform to certain representations. *Id.* at 1485. Of course, the facts in the instant case are different. Importantly, however, the *Levine* court considered the case before it as one based on assistance by action and for that reason expressly found irrelevant the question whether the alleged aiders-and-abettors had a duty to disclose. *See id.* at 1484–85 nn. 4–5. Further, in holding that the plaintiff's allegations adequately stated claims for aiding-and-abetting liability, the court applied a recklessness standard. *See id.* at 1484 (the trust company's actions "may well have been reckless—that is, highly unreasonable and constituting an extreme departure from standards of ordinary care"); *id.* at 1485 (plaintiff "could prove facts indicating [the bank's] reckless disregard, if not actual knowledge, of both [the primary violations] and the bank's role in the violations").

The Eighth Circuit also has applied a recklessness standard in an aiding-and-abetting case the court described as one "predicated on action." *First Interstate Bank*, 885 F.2d at 429, 432–33 (applying *Metge*, 762 F.2d at 621, to a case of common law aiding-and-abetting). In *First Interstate Bank*, despite various warnings and significant concerns about a particular customer, the defendant bank assisted the customer's fraud by processing accounts, handling wire transfers, and reversing a decision to require the customer to close his accounts. *See id.* at 424–28. The jury found the bank liable as an aider-and-abettor. *See id.* at 428. In affirming the denial of a motion for judgment n.o.v., the court said the "evidence supports an inference that [the defendant bank], with potential profits in mind, recklessly chose to continue its relationship with [the primary violator]." *Id.* at 432. The defendant bank made the argument—essentially the same argument put forth by Central Bank—that it had no fiduciary duty and therefore it could not be held liable for inaction without a showing of more than recklessness. *See id.* at 432–33. The Eighth Circuit rejected this argument, noting that this was "a case predicated on action" and stating that "[i]t need not be shown, therefore, that [the defendant bank] consciously intended to defraud the [plaintiff]." *Id.* at 433.

The cases discussed above reject the idea that the scienter element for aiding-and-abetting liability cannot be satisfied by recklessness without a duty to disclose. We also reject that view. We hold that in an aiding-and-abetting case based on assistance by action, the scienter element is satisfied by recklessness.

■ "[R]eckless behavior is conduct that is 'an extreme departure from the standards of ordinary care, and which presents a danger ... that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Hackbart*, 675 F.2d at 1118 (citation omitted); *accord, e.g., Hollinger*, 914 F.2d at 1569. We turn to the facts of this case, viewed in the light most favorable to plaintiffs, to determine whether the trier of fact reasonably could conclude that Central Bank was reckless when it agreed to delay the independent review of the Hastings updated appraisal.

Central Bank appears to argue that this was simply a "transaction[ ] constituting the daily grist of the mill." *Woodward*, 522 F.2d at 97. But the evidence supports the inference that this was not an ordinary transaction. Central Bank's own trust officer and others characterized this as a complicated transaction. *See* I R. tab 12, ex. G at 454; I R. tab 12, ex. B at 161. Central Bank's in-house appraiser indicated that this was the only situation in which he had been asked to review an appraisal of collateral for a bond issue. *See* I R. tab 12, ex. J at 46. Before the agreement to delay the independent review, one of Central Bank's vice-presidents assumed responsibility for the transaction from the trust officer who had been handling it. *See* I R. tab 12, ex. B at 161. Nothing in the record suggests that in any other situation had Central Bank first decided to require an independent review of an appraisal for a bond issue and later agreed to delay it.

Central Bank argues that the agreement to delay the independent review was justified in part because it was entitled to rely

on the certifications provided by the Authority and Hastings. The indenture does contain provisions to that effect. But the issue is whether agreeing to delay the independent review was an extreme departure from the standards of ordinary care that carried a known or obvious danger, not whether it was a breach of authority under the indenture. As to Central Bank's reliance on the Authority's certifications, it is significant that Central Bank previously had been warned expressly that the Authority may have "given false or misleading certifications." I R. tab 12, ex. G at 455. As to Hastings' certification, the fact that Central Bank apparently prepared a draft of it, *see* II Supp.R. tab 75, and it was not executed until June 16 (the date of the bond closing), suggest that it was given little weight in Central Bank's decision to agree to delay the independent review.

Before the agreement to delay the independent review, it is undisputed that Central Bank knew that serious concerns had been raised about the accuracy of the Hastings updated appraisal. Central Bank's own action, in originally requiring an independent review, demonstrates that it believed that those concerns were credible. As a condition to postponing the independent review of the Hastings updated appraisal, Central Bank did require that approximately $2 million worth of additional property be added to the security for the 1986 bond issue. This may have alleviated concerns about insufficient security for the 1986 bonds, but it did nothing to address the danger that the collateral was deficient for the 1988 bonds. Although the bank's duty at that time was only with respect to the 1986 bond issue, the bank was preparing to be the indenture trustee for the 1988 bond issue. Central Bank knew that the sale of the 1988 bonds was imminent, and apparently knew that the Hastings updated appraisal was being relied on to value the

collateral for the 1988 bonds. Under these circumstances, the bank's knowledge of the alleged inadequacies of the Hastings updated appraisal could support a finding of extreme departure from the standards of ordinary care.

The above are all of the facts we can discern from the record before the court for summary judgment. Although a trial might shed more light on the reasons for Central Bank's actions, and that might justify the bank's exoneration, on the basis of the record before us we hold that plaintiffs have established a genuine issue of material fact as to the scienter element of aiding-and-abetting liability.[19]

The third element of substantial assistance was not addressed by the district court.[20] Plaintiffs argue that Central Bank's agreement to delay an independent review of the Hastings appraisal constituted substantial assistance to the primary violation. Central Bank argues that although it had the *right* to require an independent review it was not required to do so under the indenture. This simply establishes that Central Bank did not breach a duty under the indenture. On the separate question of whether Central Bank rendered substantial assistance to the primary violation, which allegedly included representing the Hastings appraisal as accurate, the trier of fact reasonably could conclude that had Central Bank adhered to its original demand for an independent review and not agreed to delay it, the depleted collateral would have been discovered and plaintiffs' losses avoided. Thus, we hold that plaintiffs have raised a genuine issue of material fact as to the element of substantial assistance, and the district court's grant of summary judgment for Central Bank was inappropriate.

---

**19.** In addition to arguing that Central Bank was reckless, plaintiffs argue alternatively that Central Bank had actual knowledge of the primary violation. Because of our disposition, we need not reach this issue.

**20.** Central Bank argues that plaintiffs "absolutely ignored" the element of substantial assistance in the district court. Although plaintiffs' brief

opposing summary judgment focused on the scienter element it cited the substantial assistance element and specifically referred to the agreement to delay the independent review of the appraisal. Any suggestion that plaintiffs failed to preserve the substantial assistance issue is without merit.

REVERSED and REMANDED for proceedings consistent herewith.