DBLKM INC., f/k/a Kirchner Moore
& Company, Third–Party
Plaintiff–Appellant,

v.

RESOLUTION TRUST CORPORATION
as Conservator of Capitol Federal Savings and Loan Association of Denver,
Third–Party Defendant–Appellee.

No. 91–1150.

United States Court of Appeals,
Tenth Circuit.

July 8, 1992.

James C. Ruh and John V. McDermott of Jensen Byrne Parsons Ruh & Tilton, Denver, Colo., for third-party plaintiff-appellant DBLKM INC.

John M. Law, Roger L. Keithley, and Garrett M. Tuttle of Law, Knous & Keithley, Denver, Colo., for third-party defendant-appellee The Resolution Trust Corp. as Receiver for Capitol Federal Sav. and Loan Ass'n of Denver.

Before LOGAN and TACHA, Circuit Judges, and BRIMMER, District Judge.[*]

LOGAN, Circuit Judge.

DBLKM INC., formerly known as Kirchner Moore & Company (Kirchner), was one of several defendants in actions brought by various plaintiffs for violations of the securities laws, including § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. DBLKM settled but sought contribution, as a third-party plaintiff, from Capitol Federal Savings and Loan Association of Denver (Capitol Feder-

al). It alleged that Capitol Federal was liable as an aider-and-abettor of the securities law violations allegedly committed by DBLKM. The district court granted summary judgment for Capitol Federal, and DBLKM appealed.[1]

I

Kirchner was one of the underwriters of $11 million in bonds issued in June 1988 by the Colorado Springs–Stetson Hills Public Building Authority (the Authority). The bonds were issued to reimburse the developer, AmWest Development I Limited Partnership (AmWest L.P.), for the cost of public improvements in a large development in Colorado Springs called Stetson Hills. As underwriter, Kirchner was responsible in part for performing due diligence investigations and preparing the official statement for the bond issue. The bonds later went into default, and various purchasers of the bonds sued.[2]

Capitol Federal loaned money to AmWest L.P. pursuant to a revolving $7.5 million line of credit initiated in 1986 that was secured in part by specific parcels of land in the Stetson Hills development. The revolving line of credit was for a term of five years, with the maximum amount outstanding to be reduced to $6 million by June 30, 1987, and decreasing annually. The commitment letter for the line of credit indicated that funds raised through bond issues by the Authority would be a primary source of repayment.

In November 1987, when the cap on the revolving line of credit was $6 million, AmWest L.P. asked Capitol Federal to increase the cap to $7.5 million and loan an additional $1.5 million. AmWest L.P. indicated that the increase was necessitated by unexpected events, including deferral of $2.75 million in residential land sales in the devel-

[*] The Honorable Clarence A. Brimmer, Chief Judge, United States District Court for the District of Wyoming, sitting by designation.

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

2. This court's opinion in a related appeal more fully describes the claims of some plaintiffs and the factual background of the bond issue not directly relevant here. *See First Interstate Bank v. Pring,* 969 F.2d 891 (10th Cir.1992).

opment because of a builder's bankruptcy. AmWest L.P. informed Capitol Federal that a bond issue was planned for early 1988 and that funds from the bond issue would pay off the entire debt owing to Capitol Federal. Notes taken by a Capitol Federal representative during a meeting or telephone conversation with AmWest L.P. representatives indicate that Capitol Federal understood that the $1.5 million was needed by AmWest L.P. to pay $900,000 in outstanding bills and to make a $600,000 reserve fund payment for an earlier 1986 bond issue.

In late 1987 it appears that Capitol Federal became concerned about the commercial real estate market. Near the end of October, Walter C. Kane, Executive Vice President of Capitol Federal, recommended to Capitol Federal's Board of Directors that the institution shift its loan concentration to single-family residential construction and substantially deemphasize land acquisition and development. Later, in December, Capitol Federal's appraiser wrote a memo stating that "[t]he Colorado Springs real estate market appears to be on the verge of a negative adjustment" and "this may adversely effect the Stetson Hills development." Appendix to Opening Brief of Defendant–Appellant DBLKM Inc. at 239 (hereinafter App.).

Capitol Federal approved AmWest L.P.'s requested $1.5 million loan increase in December 1987, with a condition that AmWest L.P. "immediately use [its] best efforts to locate another lender to refinance the entire loan (original plus advance)." App. at 139. The $1.5 million additional loan was made on February 2, 1988. That same day Kane sent a letter to David J. Powers, the majority shareholder and chairman of AmWest L.P.'s general partner, reiterating the condition that AmWest L.P. would make every effort to pay off the line of credit and would not submit another draw until Capitol Federal "is satisfied that you have made every effort to refinance this line-of-credit with another financial institution." Id. at 144. Powers signed the bottom of Kane's letter, signifying AmWest L.P.'s acceptance of the condition. However, the next day, February 3, Powers sent a letter

to Kane asserting that Powers' acceptance signature was made "under duress conditions." Id. at 145. Additionally, Powers stated that Kane's February 2 letter was not a fair representation of the agreement, because Powers understood that AmWest L.P. and Capitol Federal would jointly cooperate in refinancing the line of credit and that there would be no restriction on draws. Id.

In early 1988, as part of Kirchner's preparation for the 1988 bond issue, Steven D. Jeffers of Kirchner contacted Kane regarding the relationship between Capitol Federal and AmWest L.P. Jeffers' recollection of the conversation was that Kane said that the Capitol Federal–AmWest L.P. relationship was satisfactory, that there would be no change in the relationship, and that he did not anticipate that the line of credit would be increased. Kane's recollection was that he informed Jeffers that the AmWest L.P. loan was in good standing and that they did not discuss the commitment for the $1.5 million increase. The parties seem to agree that Kane did not disclose the existence of the February 2 letter agreement regarding AmWest L.P. seeking another lender, the February 3 Powers letter claiming duress and a misunderstanding, or Capitol Federal's concerns about AmWest L.P.'s financial condition.

On June 16, 1988, the date of the bond closing, Capitol Federal executed a subordination agreement at the request of AmWest L.P. By this agreement, the deed of trust Capitol Federal held on specific parcels of land in Stetson Hills as security for the line of credit was subordinated to the assessment lien that secured the bonds. The Authority would not have been able to issue the bonds without the subordination agreement. About that time Capitol Federal received from AmWest L.P. a payment of over $5.1 million, apparently from the bond proceeds.

It appears to be undisputed that the official statement for the 1988 bonds specifically disclosed the existence of the $7.5 million Capitol Federal line of credit and AmWest L.P.'s intent to use funds from the bond issue to pay off its debt to Capitol Federal.

As of June 30, 1988, the outstanding balance on the line of credit was zero. Subsequently, between November 1988 and June 1989, AmWest L.P. made draws against the line of credit of more than $1.4 million.

The plaintiffs with whom DBLKM settled had alleged that the 1988 bonds were sold as part of a fraudulent scheme involving Kirchner and others. One complaint specifically alleged that the official statement for the 1988 bonds was materially false and misleading because it failed to disclose that AmWest L.P. had used its line of credit at Capitol Federal to replenish the 1986 bond reserve fund, which had been used in late 1987 to make payments due on the 1986 bonds. The other complaint made no allegations directly related to Capitol Federal but alleged that Kirchner and the other defendants made various fraudulent statements and omissions. The district court's first pretrial order summarized these plaintiffs' claims as including an allegation that the defendants had not disclosed that Capitol Federal "had already declared that the developer's line of credit was to be paid down and was not to be extended." *Id.* at 47.

## II

We review de novo the district court's summary judgment rulings. *Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317, 319 (10th Cir. 1991). We apply the same standard as the district court: "[s]ummary judgment is appropriate 'if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c)). We must view the evidence in the light most favorable to the party opposing summary judgment. *World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). If the trier of fact reasonably could return a verdict for the nonmoving party, summary judgment is inappropriate. *See Windon Third Oil & Gas Drilling Partnership v. FDIC*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

For DBLKM to prevail on its contribution claim it must establish that Capitol Federal is liable as a aider-and-abettor of the primary violation of the securities laws. The elements of aider-and-abettor liability are: (1) the existence of a primary violation of the securities laws by another; (2) knowledge of the primary violation by the alleged aider-and-abettor; and (3) substantial assistance by the alleged aider-and-abettor in achieving the primary violation. *E.g., Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir.1992).

Capitol Federal's motion for summary judgment was granted by the district court on the ground that there was no genuine issue of material fact as to the element of knowledge or scienter. The district court determined that Capitol Federal had no duty to disclose, and stated that without a duty to disclose recklessness does not satisfy the scienter element. Although we do not agree with the test enunciated by the district court, *see First Interstate Bank v. Pring*, 969 F.2d 891 (10th Cir.1992) (hereinafter *Pring*), we nevertheless affirm its judgment.

We address only the element of scienter, which is dispositive of this appeal.[3] DBLKM argues that the evidence establishes a genuine issue of material fact as to Capitol Federal's scienter. Viewed in the light most favorable to DBLKM, the evidence is that about the time of Capitol Federal's alleged assistance,[4] Capitol Fed-

---

**3.** Because of our disposition, we do not reach Capitol Federal's arguments that contribution is not available in this case because DBLKM and Capitol Federal are not joint tortfeasors and because DBLKM has not paid more than its fair share of the plaintiffs' losses.

**4.** DBLKM argues that Capitol Federal substantially assisted the primary violation by: (1) making the additional $1.5 million advance to AmWest L.P.; (2) assuring Kirchner that the Capitol Federal–AmWest L.P. relationship was satisfactory and not disclosing other facts about the line of credit; and (3) subordinating the deed of trust securing the line of credit to the assessment lien securing the 1988 bonds.

eral knew: (1) AmWest L.P. was developing Stetson Hills and was having financial problems; (2) AmWest L.P. had requested a $1.5 million increase in its line of credit with Capitol Federal to pay outstanding bills and replenish the 1986 bond reserve fund; (3) Capitol Federal had conditioned the $1.5 million increase on AmWest L.P.'s seeking to refinance the line of credit with another financial institution; (4) AmWest L.P. had disputed the terms of the condition; (5) the local real estate market was weakening and might adversely affect AmWest L.P.; (6) Capitol Federal had decided to deemphasize loans for land acquisition and development; (7) the entire debt then owing Capitol Federal would be paid off by proceeds from the 1988 bond issue; (8) the preliminary official statement for the 1988 bond issue disclosed this intended use of funds and accurately disclosed at least the basic terms of the line of credit; and (9) without the subordination agreement the bonds would not be sold and Capitol Federal would not receive more than $5.1 million. DBLKM argues that these facts show, on the part of Capitol Federal, at best "recklessness" or at worst "a conscious intention to bring about a wrongful act." Opening Brief of Defendant–Appellant DBLKM INC. at 20.

Scienter has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). We have held that recklessness satisfies the scienter element of aiding-and-abetting liability, at least when the assistance given is by affirmative action. *See Pring*, 969 F.2d at 903; *cf. Hochfelder*, 425 U.S. at 193 n. 12, 96 S.Ct. at 1381 n. 12 (noting that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct" but leaving the issue open). We hold that no trier of fact reasonably could find that Capitol Federal's mental state constituted intent, knowledge, or recklessness regarding the primary violation.

First, it is important to note that the primary violation alleged by all of the plaintiffs centered on representations made in the official statement regarding a specific appraisal of the Stetson Hills land securing the bonds and the nondisclosure in the official statement of actions by certain defendants to delay an independent review of that appraisal. Even if we assume Capitol Federal knew everything that DBLKM alleges, it is clear that Capitol Federal knew little or nothing about the gravamen of the alleged fraud. Capitol Federal may have known a few of the facts allegedly undisclosed in the official statement; however, on the basis of the record, no fact trier could reasonably conclude that Capitol Federal had knowledge of the fraud that was the primary violation.

■ In an attempt to show that Capitol Federal intended to assist the primary violation, DBLKM points out that Capitol Federal knew it would receive over $5.1 million from the bond issue as repayment on AmWest L.P.'s line of credit. In *Pring*, a related appeal, we recognized that having a substantial personal stake in the 1988 bond issue, by receiving a large payment from the bond proceeds, will support a finding of conscious intent to assist the primary violation. But in that appeal the defendant knew of the primary violation and the personal stake was used as circumstantial evidence to establish the third element of an aiding-and-abetting violation, substantial assistance. Here, in contrast, knowledge or scienter of the primary violation is the issue. Based on the anticipated payment from the bond issue proceeds, the trier of fact reasonably could conclude that Capitol Federal wanted the bond issue to go forward; but that is not the same thing as intent to assist a fraud. Further, Capitol Federal's repayment from the bond issue was contemplated in the original loan agreement and was disclosed in the official statement. Capitol Federal simply knew too little about the acts and omissions complained of by plaintiffs for the trier of fact reasonably to conclude that Capitol Federal intended to assist the fraud.

■ Concerning Capitol Federal's alleged recklessness regarding the primary violation, DBLKM points to two aspects of

the Kane–Jeffers conversation: (1) Kane's affirmative assurances that the Capitol Federal–AmWest L.P. relationship was satisfactory; and (2) Kane's failure to disclose certain information. We have stated that "reckless behavior is conduct that is 'an extreme departure from the standards of ordinary care, and which presents a danger ... that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Hackbart v. Holmes*, 675 F.2d 1114, 1118 (10th Cir.1982) (citation omitted). Our review of the evidence leads us to conclude that no trier of fact reasonably could conclude that Kane's affirmative assurances or nondisclosures were an extreme departure from the standards of ordinary care in a lender-borrower relationship that Capitol Federal knew or must have known presented a danger of assisting the primary violation of the securities laws.

First, as to Kane's allegedly reckless affirmative assurances, although DBLKM asserts that Kane made deliberate misrepresentations, i.e., "simply lied," when he said the lender-borrower relationship was satisfactory, nothing in the record suggests that Kane's statements were untrue or an extreme departure from the standards of ordinary care for a lender answering inquiries about one of its borrowers. In addition, nothing in the record suggests that Capitol Federal knew or should have known that Kane's statements presented a danger of assisting a violation of the securities laws.

As to Capitol Federal's allegedly reckless nondisclosures, DBLKM argues that Kane should have disclosed the following: AmWest L.P. was having financial difficulties; the local real estate market was declining; AmWest L.P. had used the $1.5 million advance in part to replenish the 1986 bond reserve fund; Capitol Federal had conditioned the advance on AmWest L.P. seeking to refinance the line of credit with another institution; and, apparently, AmWest L.P. had disputed the terms of the condition. Whether or not Capitol Federal had a duty to disclose this information,[5] on these facts no trier of fact could reasonably conclude that Capitol Federal's nondisclosure was reckless.[6] Capitol Federal simply knew so little about the primary violation that its nondisclosure could not reasonably be considered an extreme departure from the standards of ordinary care; nor could it reasonably be concluded that Capitol Federal knew or should have known that nondisclosure presented a danger of assisting the primary violation.

### III

For the foregoing reasons we hold that viewed in the light most favorable to the nonmoving party, DBLKM, the evidence does not establish a genuine issue of material fact as to Capitol Federal's scienter of the primary violation, an essential element of aiding-and-abetting liability. Therefore, summary judgment for Capitol Federal was appropriate.

AFFIRMED.

---

5. Capitol Federal contends that the rules of lender-borrower confidentiality prevented it from disclosing the terms and conditions of the line of credit to AmWest L.P. Capitol Federal argues that Kirchner could only obtain such information from AmWest L.P. itself, and Capitol Federal reasonably believed that Kirchner had or would do so.

6. In the related appeal we held that even without a duty to disclose, recklessness can satisfy the scienter element for aiding-and-abetting liability, at least when the alleged assistance was by affirmative action. *See Pring*, 969 F.2d 891. We did not address the issue of whether recklessness can satisfy the scienter element when there is no duty to disclose and the alleged assistance is by silence or inaction. Because of our holding we need not address the issue here either.